CT Corporation

**Service of Process Transmittal**
03/04/2015
CT Log Number 526691953

**TO:** Diane G Bowman, Legal Assistant
Shell Oil Company
One Shell Plaza, 910 Louisiana Street
Houston, TX 77002

**RE:** **Process Served in California**

**FOR:** JIFFY LUBE INTERNATIONAL, INC. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Randy Stevens and Elissa Stevens, Pltf. vs. Jiffy Lube International, Inc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Verification(s), Exhibit(s), Attachment(s), Cover Sheet, Instructions, ADR |
| **COURT/AGENCY:** | Napa County - Superior Court - Napa, CA<br>Case # 2665969 |
| **NATURE OF ACTION:** | Violations of the unfair trade practice defendant failure to contract to operate an automobile lubrication business - Seeking damages |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/04/2015 at 14:05 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after this summons and legal papers are served on you |
| **ATTORNEY(S) / SENDER(S):** | Vincent M. Spohn<br>Law Offices of Vincent M. Spohn, A.P.C.<br>P.O. Box 5748<br>Napa, CA 94581-0748<br>707-255-1885 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/05/2015, Expected Purge Date: 03/10/2015<br>Image SOP<br>Email Notification, Diane G Bowman DIANE.BOWMAN@SHELL.COM<br>Email Notification, Simon Bolanos simon.bolanos@shell.com |
| **SIGNED:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>818 West Seventh Street<br>Los Angeles, CA 90017<br>213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

JIFFY LUBE INTERNATIONAL, INC., A CORPORATION;
DOES 1 through 50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

RANDY STEVENS and ELISSA STEVENS

| FOR COURT USE ONLY |
| --- |
| *(SOLO PARA USO DE LA CORTE)* |
| ENDORSED |
| 2015 FEB 26  PM 2: 00 |
| CLERK OF THE NAPA SUPERIOR COURT |
| BY: **T. DeLUNA** DEPUTY |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | CASE NUMBER: |
| --- | --- |
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)*  Napa County Superior Court<br><br>825 Brown Street<br>Napa, CA 94558 | *(Número del Caso):*<br>**26 - 65969** |

**DELAY REDUCTION CASE**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Vincent M. Spohn, Esq. (CSB No. 092334) 1005 Jefferson St., Napa, CA 94559 (707) 255-1885

| DATE: February 26, 2015 | Clerk, by | , Deputy |
| --- | --- | --- |
| *(Fecha)* | *(Secretario)*  **T. DeLUNA** | *(Adjunto)* |

RICHARD D. FELDSTEIN

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

SEAL

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [✓] on behalf of *(specify):* Jiffy Lube International, Inc., A Corporation

under: [✓] CCP 416.10 (corporation)   [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courtinfo.ca.gov* |

Vincent M. Spohn, Esq. (SBN 092334)
*vms@vspohnlaw.com*
Law Offices of Vincent Martin Spohn, A.P.C.
P.O. Box 5748
Napa, California 94581-0748
Telephone:    (707) 255-1885
Facsimile:    (707) 255-0974

Attorney for Plaintiffs
RANDY STEVENS and ELISSA STEVENS

ENDORSED

2015 FEB 26  PM 2:00

CLERK OF THE NAPA SUPERIOR COURT
BY T. DeLUNA        DEPUTY

CASE MANAGEMENT CONFERENCE
DATE: 8/5/15
TIME: 8:30am
PLACE: Courtroom     I
825 Brown Street, Napa CA 94559

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF NAPA

## DELAY REDUCTION CASE

| | |
|---|---|
| RANDY STEVENS and ELISSA STEVENS,<br><br>Plaintiffs<br><br>v.<br><br>JIFFY LUBE INTERNATIONAL, INC.,<br>A CORPORATION; and DOES 1 through 50,<br>inclusive.<br><br>Defendant. | CASE NO. **2 6 - 6 5 9 6 9**<br><br>**COMPLAINT FOR DAMAGES AND<br>REQUEST FOR JURY TRIAL** |

## I. PARTIES

1.     Plaintiffs are Randy Stevens and Elissa Stevens, husband and wife, and residents of the County of Sonoma, California (hereinafter, collectively referred to as "Plaintiff Stevens"). They owned the business described herein, which was located in the County of Napa, State of California.

    a.     Plaintiff Randy Stevens is a disabled person under Civil Code section 1761(g) and Bus. and Professions Code section 17206.1.(2).

1

COMPLAINT                                                          Case No.

b.      Plaintiffs Stevens were sole proprietors.

2.      Defendant Jiffy Lube International is a corporation headquartered in the State of Delaware licensed to do business in the State of California (hereinafter referred to as "Defendant JLI").

3.      The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as DOES 1 through 50, inclusive, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe and therefore allege that each of the Defendants designated herein by fictitious name is in some manner responsible for the events and happenings herein referred to, and caused damages proximately and foreseeably thereby by Plaintiffs as hereinafter alleged.  Plaintiffs ask leave of the Court to amend this Complaint when the true names and capacities have been ascertained.

4.      That at all times herein mentioned, each and every Defendant herein was the agent, servant, employee, partner and/or joint venture of the other Defendants herein; that at all times, each of said Defendants was acting within the course and scope of said agency, service, employment, partnership and joint venture.

## II. STATEMENT OF FACTS

5.      Plaintiffs incorporate by reference and set forth in full the allegations of Paragraphs 1 through 4, hereinabove stated.

6.      This case involves the purchase of a Franchise Agreement, for a Jiffy Lube Franchise to operate an automobile lubrication business (hereinafter "Business") and the termination thereof. The location of the Business was on leased premises located in the City and County of Napa, California, located at 605 Lincoln Avenue, Napa, California 94558.  It included, among other things, a free-standing multi-tenant structure in which the business was operated.

7.      Plaintiffs Stevens were offered the opportunity to purchase the Business in 1996.  After negotiations, Plaintiff Stevens purchased a business franchise from American Oil Change Corporation ("AOCC").  AOCC later merged into Jiffy Lube International Inc. ("JLI").

8.      The purchase of the Business was memorialized in five documents ("Contract Documents"), which collectively set forth the ongoing rights and obligations of Purchaser (Plaintiffs

2

Stevens) and Seller (AAOC).  They were intended to be in full force and effect throughout the Term specified in the Franchise Agreement. The Contract Documents consist of:

        (a)    An Asset Purchase Agreement ("APA"), a copy of which is attached hereto as Exhibit "A";

        (b)    A Franchise Agreement ("FA") with First Addendum, copies of which are attached hereto collectively as Exhibit "B";

        (c)    A Sublease Agreement ("SUBLEASE"), a copy of which is attached hereto as Exhibit "C";

        (d)    Federal Trade Commission Rule Part 436 (16 CFR Part 36), a copy of which is attached hereto as Exhibit "D"

        (e)    1996 Uniform Franchise Offering Circular ("UFOC"), a copy of which is attached hereto as Exhibit "E";

9.    None of these Contractual Documents were drafted by Plaintiffs Stevens.

10.    Among other things, all of these documents were executed by Purchaser and Seller, and were exchanged for a purchase price of $301,394.00, paid by Plaintiffs Stevens.

11.    With the exception of any Addenae not yet in existence, the APA incorporated each of these documents into the APA itself with the intent of making each document part of an overall contract which JLI's predecessor in interest (AAOC) entered into with Plaintiffs Stevens.

12.    When Plaintiffs purchased the franchise, the building and land upon which the business was operated were  owned by USA Gasoline, which then sold them to Tesoro Sierra Properties, LLC, a Delaware limited liability company ("Tesoro").  Over time, Tesoro became the Master Lessor to JLI, which became the Prime Leasee.

13.    Under the APA, the Seller of the business was AOCC, whose parent company was Pennzoil Company, which also owned JLI, defendant herein.  In 1997, Pennzoil not only owned AOCC, but also Defendant JLI, Inc., and Jiffy Lube International, Inc. of Maryland ("JLIM").  In 2000, Defendant JLI merged into AAOC, a Delaware Corporation, which then changed it name to JLIM.

14.     The APA, executed by Plaintiffs Stevens, by its terms provided for the sale to Plaintiffs Stevens of the assets, business, equipment, inventory and any rights the Seller had regarding the real property, among other things.  It directed JLI to be the prime lessee/landlord and JLIM to be the Franchisor.  In January 2008, JLI merged into JLIM, thus making Defendant JLI both the franchisor and the Prime Lessee at the Business' location, a material modification of the Franchise Agreement, to which Plaintiff Stevens never agreed.

15.     Under APA, Article 2.  RECITALS:  Plaintiffs Stevens purchased the Assets of the business.

16.     Under APA, Article 3.  DEFINITIONS (a) (ii):  The Assets of the business included "agreements and rights associated with the Business or used in the conduct of the Business...".

17.     The SUBLEASE between JLIM and JLI was an "agreement" associated with the "business".  Such Lease was included in the APA and was set forth at Appendix 3(j) thereto.

18.     Under APA Article 8.6, JLI, AOCC (and thereafter JLI) possessed the power to sublease the property to Plaintiff Stevens.

19.     As part of the Purchase of the Business, Plaintiff Stevens also purchased rights set forth in the FA, which was attached to the APA as Exhibit 3(f)1.  Among the rights purchased were those set forth at Section 4 TERM AND RENEWAL, 4.11, to wit, a 20-year term of the Franchise Agreement commencing on the effective date of the Franchise Agreement in January 1997.  Plaintiffs Stevens also were entitled to renew the Franchise Agreement for two consecutive terms of 10 years each.  See Franchise Agreement 4.2, et seq.  Such terms were a critical part of the consideration Plaintiffs Stevens bargained for in exchange for the purchase price. Plaintiffs intended the purchase of the Business to be their sole means of support for the rest of their lives.

20.     Plaintiffs Stevens had a right to stay at the location for the Term of the Franchise Agreement, as extended by the Addendum, as long as they performed their obligations thereunder.

21.     No action or inaction of Plaintiffs Stevens caused them to lose the right to stay at the location.

22.     Because the Term in the Franchise Agreement and the lease of the free-standing structure at the Napa location were part of the purchase, the APA obligated JLIM or its successor-in-

4

interest to extend the Sublease to the business' real property to run concurrently with the Franchise Agreement, so that Plaintiff Stevens could have a significant part of what they purchased. Such extension(s) were part of the "rights and assets of the Seller....used or usable in, or relate to, the ownership or operation of the business." See APA Section 3 (a).

23.     Under APA Section 4: SALE AND TRANSFER OF ASSETS, INSTRUMENTS OF TRANSFER, Seller was required to deliver the Assets to Plaintiff Stevens, the buyer, free and clear of encumbrances created by Seller throughout the term of the Franchise Agreement.

24.     Under APA Section 5: NO ASSUMPTION OF LIABILITIES OR OBLIGATIONS, the Seller was required to be continually responsible for the preservation of the SUBLEASE , a contract associated with the business.

25.     Under APA Section 8.3: REPRESENTATIONS OF SELLER, Seller represented that it would not give or "create rights in third parties..." with respect to "the Assets or the Lease." The definition of "Lease" in the APA is plural (meaning both Lease and Sublease). The Sublease was not disclosed as an exhibit to the APA, notwithstanding AOCC obtaining the consent of USA Gasoline to allow JLIM to be Prime Lessee and sublease to Stevens per APA Section 14.1.

26.     APA Section 15: POST-CLOSING RESPONSIBILITIES, Section 15.1 required the Seller, without further consideration, to execute and deliver such further instruments of conveyance and transfer and take such other action as Purchaser may reasonably require for the transfer of the Assets. Among other things this meant that seller was obligated to extend any lease or sublease needed by plaintiffs to operate their business.

27.     The FA contains an arbitration provision which is both procedurally and substantively unconscionable. The FA took the form of an adhesion contract, it was imposed and drafted by a party of superior bargaining strength that relegated to the subscribing party only the opportunity to adhere to the contract or reject it. Plaintiff Stevens had no reasonable alternative but to sign it. The business setting, purpose and effect was that of a large nationwide corporation dealing with two individuals, husband and wife, the purpose of which was to close the transaction. Its effect without proper advisement of Plaintiffs' right was to cause the consummation of the transaction without Plaintiff having been advised of their statutory rights as required by law.

28.     The FA was procedurally unconscionable because the manner in which it was negotiated subjected the beleaguered party to oppression and surprise. There was unequal bargaining power between the parties. There was no real negotiation or meaningful choice by the weaker party nor was there any opportunity for negotiation. Plaintiffs were surprised later to find out that the law of the State of California and the United States of America required that certain provisions be inserted into the offering circular; which were not. Such provisions, inter alia, dealt with arbitration. (See Paragraph 32, infra).

29.     The FA was substantively unconscionable because the terms of the contract were one sided, overly harsh, or unfair. There was lack of mutuality.

30.     In 1996, when Plaintiffs purchased the franchise, California's Franchise Investment Law (California Corporation Code Section 31000, et seq.) ("FIL") required that all applicants for registration under the FIL use the Uniform Franchise Offering Circular guidelines (UFOC) as amended by the North American Securities Administrators Association, Inc. (NASAA) on April 25, 1993 as their disclosure format (hereafter the "1993 UFOL"). Such UFOC disclosure required it to be prepared, amended, reviewed or filed on or after January 1, 1996, to satisfy the requirements of the 1993 UFOC guidelines which were approved by the Federal Trade Commission on December 30, 1993 (See 58 FR 69, 224).

31.     The offer and sale of franchises was also subject to Federal law requiring disclosure requirements and prohibitions, as set forth in the Federal Trade Commission's Rule Part 436 (16 CFR Part 436) ("Part 436"). As of January 1, 1996, California required compliance with Part 436 -- all franchisers had  to comply with the disclosure requirements of Part 436 through the use of the 1993 UFOC. See EXHIBIT "D".

32.     To require Plaintiff to arbitrate this claim under any provision of the Contract Documents, (see paragraph 8, supra) would be substantively and procedurally unconscionable for the following reasons:

> (a) ARBITRATION DISCLOSURES          The Part 436 guidelines require that, inter
> alia, the following language be listed on the UFOC:

6

"iv.    If applicable disclose the following risk factors using the language on

the cover:

   1.    THE FRANCHISE AGREEMENT PERMITS THE FRANCHISEE (TO SUE) (TO ARBITRATE WITH) _____ ONLY IN _____. OUT OF STATE (ARBITRATION (LITIGATION) MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST MORE (TO SUE) (TO ARBITRATE WITH) _____ IN ___ THEN IN YOUR HOME STATE.

   2.    THE FRANCHISE AGREEMENT STATES THAT LAW GOVERNS THE AGREEMENT, it AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

   3.    THEIR MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

   v.    In addition to the above language, disclose other risk factors required by

a state regulator.

   vi.    use capital letters for risk factor disclosure.

This language was absent from the offering circular used by defendant JLI's predecessor in interest.

       (b)  TERM OF AGREEMENT.  Part 436 guidelines required that the franchise must be

clearly stated on the UFOC.  The sample UFOC Guide at Item 17 RENEWAL, TERMINATION,

TRANSFER and DISPUTE RESOLUTION states:

       "Use a separate table for any other significant franchise-related

       agreements.  If a provision in any other agreements affects the provisions

       of this franchise related agreements disclosed in this Item (for example,

       the term of the franchise will be equal to the term of the lease), disclose

       that provision in the applicable category in the table."

       (b)(1)  The Federal Guidelines Part 436, of the 1993 UFOC at paragraph 150 defines

"disclose" as follows:

       "Disclose means to state all material facts in an accurate and

       unambiguous manner.  Disclose clearly, concisely and in a narrative form

       that is understandably by a person unfamiliar with the franchise business."

       (b)(2)  The Lease for Premises is a required disclosure under the Federal Guidelines.

The Lease was not disclosed.

<center>7</center>

(b)(3) The 1996 UFOC, Exhibit "E", given to Stevens, at Item 17 RENEWAL, TERMINATION, TRANSFER and DISPUTE RESOLUTION does not comply with the disclosure requirements of the Federal Guidelines Part 436 required for Term of Agreement. The 1996 UFOC states the term was for twenty (20) years with two ten (10) year extensions. The true fact is JLI terminated at year 17 citing a lease agreement not disclosed in the UFOC. The Federal Guidelines Part 436, of the 1993 UFOC at Item 17 RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION state:

> "iii. Use a separate table for any other significant franchise-relate agreements. If a provision in any other agreements affects the provisions of the franchise or franchise-related agreements disclosed in this Item (for example, the term of the franchise will be equal to the term of the lease), disclose that provision in the applicable category in the table."

There were no other disclosures under category "a. Length of Term of the franchise." There were no other disclosures in a separate table regarding term.

(b)(4) The instructions to Stevens in the 1996 UFOC given to Stevens at ITEM 17, page 66 provide: "This table contains important provisions of the Franchise Agreement and related agreements." The Lease Agreements were not attached, nor were they made part of the offering circular (1996 UFOC).

> (c) CONTRACTS. All contracts associated with the transaction must have been included in the UFOC, which provides, at item 22: "Contracts"
> Item 22 entitled "CONTRACTS" directs: ATTACH A COPY OF ALL AGREEMENTS PROPOSED FOR USE OR IN USE IN THIS STATE REGARDING THE OFFERING OF A FRANCHISE, INCLUDING, THE FRANCHISE AGREEMENT, LEASES, OPTIONS AND PURCHASE AGREEMENTS. Further, Item 22 had specific instructions regarding contracts:
> "i) copies of agreements attached to the offering circular under item 22 are part of

8

1    the offering circular.  Each offering circular delivered to a prospective franchisee
2    must include copies of all agreements to be offered.

3  In Plaintiffs case, these documents were all missing:  the prime lease with JLI as the prime lessee and
4  between USA GASOLINE as LESSOR, the SUBLEASE between JLI and Stevens, the leasehold deed
5  of trust, the $100,000 interim promissory note between JLI and Stevens, the APA, Security
6  Agreements, and Exhibit 6.1 to the Security Agreements.

7

8                          (d) CONFIDENTIAL INFORMATION

9         Paragraph 20.8.2 of the FA provides that there are certain claims that are not subject to
10  arbitration.  Among those are: (a) any claim involving actual threatened disclosure or misuse of
11  "confidential information"; (b) any claim or dispute involving the ownership, validity, or use of the
12  proprietary marks; (c) any action to enjoin a transfer alleged to be in violation of section 14 of the FA.

13         (d)(1) "Confidential Information" includes the disclosure of Contracts associated with
14  the transaction at the time the UFOC was given to Stevens. Under Federal guidelines, each UFOC
15  shall contain the information required by the Uniform Franchise Registration Application.  The 1993
16  Federal Guidelines of the Uniform Franchise Offering Circular ("UFOC"), as amended by the North
17  American Securities Administrators Association, Inc. on April 25, 1993 were in effect in 1996 when
18  JLI sold the franchise to Stevens.  The Federal rule required JLI to include the prime lease, sub-lease,
19  the leasehold deed of trust, the $100,000 interim promissory note between JLI and Stevens, the APA,
20  Security Agreements, and Exhibit 6.1 to the Security Agreements.  JLI misused the confidential
21  information by its failing to disclose such information.

22

23                          (e) PROPRIETARY INFORMATION

24         Defendant JLI claims it owns the proprietary Marks and trade secrets. Plaintiffs, however,
25  purchased the assets including the right to use the trademarks and trade secrets and rights associated
26  with the Business (see 3 DEFINITIONS (A) (ii) "assets" shall mean all the rights and assets of the
27  seller... All intangible property and such contract rights as are specifically assumed herein,
28  trademarks, trade secrets, patents, patent applications, permits, licenses, agreements and rights

9

1  associated with the business or using the conduct of the business at the centers.....). Plaintiffs Stevens
2  claims the right to use such proprietary information, which was an "asset". Defendant JLI breached
3  the FA by unlawfully denying him access contained in the POS system and computers when it
4  unlawfully turned off the system at termination.

5          (f) FAILURE TO REGISTER. As of the effective date of the sale of the franchise to
6  Stevens, January 9, 1997, JLI was not registered by the California Department of Corporations as a
7  Franchisor.

8          33.     Before the Lease at the Napa location was due to expire, in June 2013, Tesoro, as
9  Master Lessor, extending its consent under APA Section 14.1, sent Plaintiff Randy Stevens a Third
10 Amendment of Lease, to be executed by Defendant JLI, which, if so executed, would have allowed
11 Plaintiffs to stay at the location for the duration of the Term in the Franchise Agreement.

12         34.     With neither notice nor justification, JLI refused to execute the proposed Third
13 Amendment of Lease, and instead terminated Plaintiff Stevens in blatant disregard of the provisions of
14 the Contract Documents.

15             (a)     No provision of The California Franchise Relations Act (Bus. and Professions
16 Code Section 20020) relieved defendant JLI of its obligation to give Plaintiffs 30 days good cause
17 notice of termination.

18             (b)     Specifically, California Bus. and Professions Code section 20021(j) did not
19 apply because no franchise fees or other amounts were due either to the Franchisor or to its affiliate.
20 The obligee of Plaintiffs' financing as of 2013, was neither an owner nor a parent company nor an
21 affiliate of Defendant. See California Corp. Code 28032.

22             (c)     No other provision of law relieved Defendant JLI of its obligation to give
23 Plaintiffs a Notice of Termination, specifically Bus. and Professions Code section 20025 of 180 days'
24 notice.

25         35.     Without the notice sent to plaintiffs required by FA paragraph 20.7 ("Notices") and
26 Bus. and Professions Code section 20030, Defendant JLI turned off point of sale business computers,
27 immediately destroying plaintiff Stevens' ability to stay in business, which forcibly closed the
28 business. At the time of these events Plaintiff Randy Stevens was a disabled person under California

10

1  Civil Code section 1761(g), and Bus. and Professions Code section 17206.1.(2), a status of which
2  Defendant JLI was well aware.

3      36.     Under the Franchise Agreement paragraph 18.1, Defendant JLI was required to
4  reimburse Plaintiff Stevens (or credit Plaintiff Stevens' accounts with JLI and its affiliates) an amount
5  equal to one half of the then-current price quoted by Heritage Merchandising Company, Inc., for any
6  tools, equipment, and non-inventory personal property owned by the franchisee and remaining at the
7  franchise center at the time of the termination, plus Plaintiff Stevens' actual cost for any usable
8  inventory owned by Plaintiff Stevens and remaining at the center at the time of the termination of the
9  Franchise Agreement Bus. and Professions Code section 20035 as parallel requirements for
10 reimbursement.  JLI was thus required to reimburse Plaintiffs Stevens or credit them with the above-
11 mentioned assets.  JLI failed to do so.

12                           **FIRST CAUSE OF ACTION**
13                       **DECEPTIVE BUSINESS PRACTICES**
14                        **(Plaintiff against all Defendants)**

15      37.     Plaintiffs incorporate by reference as though set forth in full the allegations of
16 Paragraphs 1 through 36, as hereinabove stated.

17      38.     The actions described above constitute deceptive practices under California Civil Code
18 (hereinafter CA CC) 1750, 1761 and 1770. The termination of plaintiffs' franchise was unfair in that:

19          a) the sale of the Business constituted a sale or lease of goods or services to plaintiffs
20 Stevens and was unlawful because the UFOC used by defendant JLI, or its predecessor-in interest
21 misrepresented the source, sponsorship, approval or certification of goods and services associated with
22 the Business, as hereinafter set forth.

23          b) Defendant JLI or its predecessors in interest used deceptive representations in
24 connection with the sale of the franchise. The representations are stated at paragraph 64.

25          c) the representations made by defendants not only in the sale of the business but also
26 in its termination, purportedly involved rights, and remedies which it did not have. See CA. CC
27 1740(14).

28

                                        11

1            d) Defendant JLI or its predecessor-in-interest inserted an unconscionable provision in

2 the contract, i.e. a clause requiring arbitration after failing to follow federal and state law with respect

3 to the UFOC (CA. CC 1770(a)(19).

4            e) Defendant JLI or its predecessor in interest sold a 20 year franchise with intent not to

5 sell the term as advertised after failing to follow federal and state law with respect to the UFOC (CA.

6 CC 1770 (9)).

7            f) Defendant JLI or its predecessor in interest misrepresented disclosures of contracts as

8 if they were approved or certified by state and federal franchise laws after failing to follow federal and

9 state law with respect to the UFOC (CA. CC 1770(2)

10            g) Defendant JLI or its predecessor in interest misrepresented disclosures of contracts

11 as if it were approved or certified by state and federal franchise laws after failing to follow federal and

12 state law with respect to the UFOC (CA. CC 1991(2))

13            h) Defendant JLI or its predecessor in interest misrepresented it was registered to sell

14 franchises in California as of January 9, 1997, the effective date of the APA. (CA. CC 1770(2)

15      39.      As a disabled person, plaintiff Randy Stevens is entitled to the protection of California

16 CA. CC 1780 (A) (1) (3) (4) and (5), and (E).

17      40.      As a disabled person under CA. CC 1761 (g) by the terms of CA. CC 1750,et seq., a

18 trier of fact is authorized to impose a fine, penalty, or other remedy. Defendant JLI knew or should

19 have known that CA. CC 3345 (b) (2) (3) and justify the imposition of treble damages under CA. CC

20 3345.

21      41.      Defendant's actions as hereinabove described have caused damage to plaintiffs

22 Stevens; they lost their means of support, and a lifetime investment.

23      42.      Plaintiffs have incurred attorney's fees and costs in bringing this cause of action.

24      43.      The actions of defendant JLl, which ratified its predecessor in interest's actions, and

25 which terminated plaintiff's Stevens from the business were fraudulent, malicious, and oppressive

26 actions, and justify the imposition of punitive damages under California Civil Code section 3294.

27

28

12

44.     Plaintiff Randy Stevens attempted to notify Defendant JLI, and in fact did notify Defendant JLI complaining of its conduct and requesting non-judicial remedies; but Defendant JLI ignored his pleas.

Wherefore plaintiffs pray for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION:
## BREACH OF CONTRACT
### (Plaintiffs Against All Defendants)

45.     With the exception of paragraph 43, Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 44 as hereinabove stated.

46.     On or about January 1996, Defendant, as franchisor of Jiffy Lube, granted Plaintiffs a franchise to conduct business of such enterprise at Napa, California.  Plaintiffs continuously conducted the business of the franchise from that time until June 13, 2013, when Defendant terminated the franchise and thereafter refused to supply and service Plaintiffs' business as called for under the Franchise Agreement.

47.     The termination was improper in that good cause did not exist for the termination, and because Defendant failed to send Plaintiff proper notice of termination, affording a reasonable opportunity to cure any default.  Moreover, no cause existed for immediate termination without the opportunity to cure the default.  Defendants failed to provide Plaintiff's with proper notice 180 days prior to the intended non-renewal of the franchise.  Lastly, no such statutory ground existed which permitted Defendant JLI to refuse to extend the SUBLEASE.

48.     In terminating the Franchise, in accordance with the provisions of the Franchise Relations Act, Business & Professions Code Section 20000 to 20041, Defendant was obligated but failed to properly offer to repurchase  the reusable current inventory of the franchise from plaintiffs for an amount that met Defendant JLI's  then-present standards and was held for use or sale in Plaintiffs' business.  The fair repurchase price of the inventory would have been $105,000.00, or in an amount according to proof, representing the fair wholesale market price value thereof.

13

49.     The APA provides for attorneys' fees at Section 17.4.  Plaintiffs have incurred and will incur attorneys' fees in bringing this action.

50.     Defendant breached the above-referenced contracts in the following ways:

(a)     Without justification, Defendant refused to execute the proposed Third Amendment to Sublease (hereinafter "JLI's refusal").

(b)     JLI's refusal constituted a material breach of the FA's Paragraph 4, in that defendant's actions caused the franchise to terminate before the end of the term.

(c)     JLI's refusal constituted a material breach of the APA's Section 4, in that defendant failed to execute and deliver the SUBLEASE to Plaintiffs.

(d)     JLI's refusal constituted a material breach of the APA's Section 5, in that the termination of the franchise after refusing to execute the sublease was a failure of defendant to honor, satisfy, and or discharge all contractual obligations and liabilities as they became due.

(e)     JLI's refusal constituted a material breach of the APA's Section 8.3 in that the right to occupy the premises and operate the Business was taken away from plaintiffs as JLI created rights to third parties with respect to the assets or the Business.

(f)     JLI's refusal constituted a breach of the Franchise Agreement paragraph 10 and 18.1, in that it made no reimbursement for equipment and inventory.

(g)     JLI's refusal constituted a material breach of the Asset Purchase Agreement, Section 15.1. in that defendant JLI, as Seller's successor in interest, failed to execute and deliver the sublease – – an instrument of conveyance and transfer ----and to take such other action as was reasonably required for the transfer of the assets.

(h)     JLI's refusal constituted a breach of the Franchise Agreement paragraph 10 it caused the Point of Sale computer program to be shut down.

(i)     The Franchise Agreement, Section 20.7 required notice to be given to Plaintiffs. They received none.

(j)     Defendant JLI failed to return Plaintiff's deposit within 30 days and cut short his right to possession of the premises after he had paid rent therefore.

14

1    (k)    JLI's refusal constituted a material breach of the APA Section 14.1 whereby
2  Tesaro as Prime Landlord extended its consent to extend the Lease in that JLI was obligated to extend
3  the Sublease to Stevens.

4    (l)    JLI's lease termination on June 18, 2013 constituted a breach of the Sublease in
5  that Stevens paid and JLI accepted rent through June 30, 2014.

6    51.    The termination was improper in that good cause did not exist for the termination, and
7  because Defendant failed to send Plaintiff proper notice of termination, affording a reasonable
8  opportunity to cure any default. Moreover, no cause existed for immediate termination without the
9  opportunity to cure the default. Defendants failed to provide Plaintiffs with proper notice 180 days
10  prior to the intended non-renewal of the franchise. Lastly, no such statutory ground existed which
11  permitted Defendant JLI to refuse to extend the SUBLEASE.

12    52.    In terminating the Franchise, in accordance with the provisions of the Franchise
13  Relations Act, Business & Professions Code Section 20000 to 20041, Defendant was obligated but
14  failed to properly offer to repurchase the reusable current inventory of the franchise from plaintiffs for
15  an amount that met Defendant JLI's then-present standards and was held for use or sale in Plaintiffs'
16  business. The fair repurchase price of the inventory would have been $105,000.00, or in an amount
17  according to proof, representing the fair wholesale market price value thereof.

18    53.    The APA provides for attorneys' fees at Section 17.4. Plaintiffs have incurred and will
19  incur attorneys' fees in bringing this action.

20    54.    Plaintiffs have suffered damages resulting from Defendants' improper termination of
21  the Business and caused by the breaches hereinabove described. They have lost their investment in
22  the franchise, which at the time of the unlawful termination, had a value in excess of $750,000.00.
23  They have also lost profits they would have made in the business and interest thereon.

24    Wherefore, plaintiffs pray for judgment as hereinafter set forth.
25  ///
26  ///
27  ///
28  ///

15

COMPLAINT                                           Case No.

**THIRD CAUSE OF ACTION:**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 et seq.**

**Unfair Acts or Practices**

**(Plaintiffs Against All Defendants)**

55.     Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 52 as hereinabove stated.

56.     This court has jurisdiction over this action pursuant to Business and Professions Code Section 17200 et seq. specifically Business and Professions Code Section 17203.

57.     The above described actions of defendant JLI occurred while plaintiffs were operating the business as franchisees of defendant JLI.

58.     The above described actions of defendant JLI form the basis of plaintiffs' claim.

59.     Defendant's acts are unfair in that they caused plaintiffs to lose their sole means of supporting themselves, a life – long investment, salaries, profits, and the worth of the franchise business itself.

60.     Defendants actions have caused plaintiff injury as hereinabove set forth.

61.     As a disabled person, plaintiff Randy Stevens is entitled to the protection of California Bus. and Professions Code section 17206.1.(3).

62.     As a disabled person under Bus. and Professions Code section 17206.1.(2) by the terms of CC 17200,et seq., a trier of fact is authorized to impose a fine, penalty, or other remedy. Defendant JLI knew or should have known that California CC 3345 et seq and justifies the imposition of treble damages.

Wherefore plaintiffs pray for judgment as hereinafter set forth.

///

///

///

///

///

16

1                     **FOURTH CAUSE OF ACTION:**

2                  **INTENTIONAL FRAUD AND DECEIT**

3                  **(Plaintiffs Against All Defendants)**

4      63.    Plaintiffs incorporate by reference as though set forth in full the allegations of

5 paragraphs 1 through 68 as hereinabove stated.

6      64.    Defendant JLI or its predecessor in interest made the following representations to

7 plaintiffs:

8                 a)    under APA section 4 it represented that it was going to deliver the assets

9                        to plaintiff Stevens, the buyer, free and clear of encumbrances created

10                        by seller throughout the term of the Franchise Agreement;

11                 b)    under APA section 5 it represented that it would be continually

12                        responsible for the preservation of the Sublease;

13                 c)    under APA section 8.3 it represented that it would not give or create

14                        rights in third parties with respect to the assets or the Lease;

15                 d)    under APA section 15 it represented that it would execute and deliver

16                        such further instruments of conveyance and transfer and take such other

17                        action as purchaser may reasonably require for the transfer of assets.

18      65.    The representations were false.  The true facts are:

19

20                 a)    it failed to deliver the assets to plaintiff Stevens free and clear of

21                        encumbrances throughout the term of the franchise agreement;

22                 b)    it rejected its responsibility for preserving the Sublease, and terminated

23                        plaintiffs' rights thereunder;

24                 c)    it created rights and third parties with respect to the assets and the

25            Sublease in that it gave the asset back to the Prime Lessor;

26                 d)    it failed to execute and return the asset of the Sublease which plaintiffs

27                        reasonably required to stay in business.

28

17

COMPLAINT                                               Case No.

66.    The above stated representations were made by defendant JLI's predecessor in interest during the months preceding the execution of the contract documents in January, 1997.  They were made in written documents sent to plaintiffs in the regular course of the United States mail.

67.    The failures to disclose information and the suppression of information by Defendant JLI, Inc. were made with the intent to induce Plaintiff to act in the manner alleged in reliance on them.

68.    Plaintiff, at the time these failures to disclose and suppression of facts occurred, and at the time Plaintiff took the actions alleged, was ignorant of the existence of the facts that Defendant suppressed and failed to disclose.  If Plaintiff had been aware of the existence of the facts not disclosed by Defendant, Plaintiff would not have, as he did, purchased the franchise, as he did so justifiably relying upon defendant's representations that it would live up to the terms of the contract documents.

69.    Plaintiffs Stevens justifiably relied on JLI because of the stature of the company and the extensive business conducted by it.

70.    As a proximate result of the fraudulent conduct of Defendant as herein alleged, Plaintiffs Stevens have been damaged in an amount according to proof.  They lost their business, the opportunity to earn salaries from it, and the profits they would have earned from its sale to a third-party.

71.    Defendant's actions as hereinabove described, were fraudulent, malicious, and oppressive, and justify an award of exemplary or punitive damages under California Civil Code section 3294.

Wherefore plaintiffs pray for judgment as hereinafter set forth.

///

///

///

///

///

///

///

18

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (Plaintiffs Against All Defendants)

72.     Plaintiffs incorporate by reference as though set forth in full herein each and every allegation contained in Paragraphs 1 through 60 as if set forth in full herein.

73.     Defendant, or its predecessor(s)-in-interest and each of them, when they made these representations concerning the franchise to the Plaintiffs had no reasonable ground for believing that their representations were true, and Defendants, and each of them, made their representations with the intent to induce Plaintiffs to take actions herein alleged, and with the intent to prevent Plaintiffs from further inquiring into the effect of the franchise.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SIXTH CAUSE OF ACTION

## CONCEALMENT

### (Plaintiffs Against All Defendants)

74.     Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 73 as hereinabove stated.

75.     Defendant JLI or its predecessor(s)-in –interest concealed or suppressed material facts as follows. The contracts and information discussed at paragraph 32, supra were required to be disclosed by Defendant JLI or its predecessor(s)-in-interest before or at the time of Plaintiff's purchase of the business.

76.     Such contracts and information were not disclosed as required by the UFOC.

77.     Defendant JLI or its predecessor(s)-in-interest concealed or suppressed material facts it was bound to disclose by statutory or contractual directives.

19

78.     Defendant JLI or its predecessor(s)-in-interest concealed or suppressed these facts with the intent to defraud and induce Plaintiffs to execute the Contract Documents listed at paragraph 8, supra. At the time Plaintiffs acted, Plaintiffs were unaware of the concealed or suppressed facts and would not have taken the actions they did if they had known the facts.

79.     In justifiable reliance upon Defendant's conduct, Plaintiffs were induced to act, i.e. they were induced to execute the Contract Documents, and enter into the Business and to continue to operate the business.

80.     Because of Plaintiffs reliance upon Defendant's conduct, Plaintiffs have been damaged as hereinabove described.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION:
## CONVERSION OF PROPERTY
### (Plaintiffs Against All Defendants)

81.     Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 80 as hereinabove stated.

82.     On or about June, 2013, Plaintiffs were entitled to possession of goods, inventory, fixtures, and equipment.

83.     On or about June, 2013, as part of turning over the Premises of the Business to Prime Lessor, defendants took possession of the premises and seized plaintiffs' goods, inventory, fixtures and equipment, without justification, permission, or consent of plaintiffs.

84.     Defendant's theft of this property resulted in defendants establishing dominion over such property thereby depriving Plaintiff of his property rights therein.

85.     Defendant's actions in seizing the goods, inventory, fixtures, and equipment, were intentional, and damaged Plaintiffs.

Wherefore plaintiffs pray for judgment as hereinafter set forth.

///

///

20

COMPLAINT                                                        Case No.

**EIGHTH CAUSE OF ACTION:**

**INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONSHIPS**

**(Plaintiffs Against All Defendants)**

86.     Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 85 as hereinabove stated.

87.     Since January, 1996, plaintiffs had a contract with defendant or its predecessor in interest. That contract was embodied in the Contract Documents, as hereinabove stated, and as attached hereto and incorporated herein by reference. The contract, and all its parts, was a valid one.

88.     Plaintiffs enjoyed economic relationships with third party customers who would pay for goods and services at the Jiffy Lube automobile lubrication center. Such relationships contained future economic benefit to plaintiffs.

89.     Defendant JLI knew of the above described economic relationships with third-party customers existing between Plaintiff and the customers, in that defendant regularly received reports and collected various forms of revenue which were based upon plaintiffs successfully doing business with such customers.

90.     The actions of defendant were intentionally designed to disrupt the relationships that plaintiffs had with customers in that defendant knew that when it terminated the POS and caused plaintiffs to lose access to their computers, that it would disrupt such relationship. Defendant knew that plaintiffs would be out of business because of their actions.

91.     The termination of plaintiff's rights under the contract documents constituted a disruption of plaintiffs economic relationships with their customers.

92.     The disruption of the economic relationships and the forced closure of plaintiff's business and the bad faith denial of defendant regarding the rights and obligations plaintiffs had in the contract documents were a proximate cause of actual damages suffered by plaintiffs, as herein above set forth.

93.     The actions of defendant as hereinabove described were willful and intentional. They were fraudulent, malicious and oppressive and justify the imposition of exemplary and or punitive damages.

21

Wherefore plaintiffs pray for judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION:
## NEGLIGENCE
### (Plaintiffs Against All Defendants)

94.     Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 93 as hereinabove stated.

95.     All defendants owed a duty to Plaintiffs to disclose to Plaintiffs all of the information required by law so that they could enter into the franchise agreement and related contracts fully informed as to the consequences of their decision.  Defendant JLI had a duty to live up to the terms of the Contract Documents and to perform thereunder.

96.     All Defendants breached such duty as hereinabove described.  See specifically paragraphs 49(a) –(j).

97.     As the direct result of the negligence of Defendants, and each of them, Plaintiffs have been damaged in a sum according to proof.  Such damages include, but are not limited to, the loss of the use and profitability of the franchise, loss of the franchise itself, and loss of personal property, and other general and specific consequential damages.

Wherefore plaintiffs pray for judgment as hereinafter set forth.


## PRAYER FOR RELIEF


**WHEREFORE**, Plaintiffs pray for judgment as hereinafter set forth:

1.      For general and special damages in an amount according to proof.

2.      For interest thereon at the legal rate according to proof.

3.      For costs of suit herein occurred;

4.      For treble damages under Causes of action FIRST, THIRD;

22

1        5.     Under Cause of Action FIRST. for restitution and/or disgorgement of all revenues,

2   earnings, profits, compensation, and benefits which may have been obtained by defendant(s) as a

3   result of such unlawful business acts or practices;

4        6.     For statutory remedies under Cause of Action FIRST and THIRD.

5        7.     For a civil penalty for each unfair violation; pursuant to statute.

6        8.     For reasonable attorney's fees as allowed by statute and/or contract.

7        9.     For punitive damages under causes of action THIRD, FOURTH, SIXTH, SEVENTH

8   and EIGHTH according to proof, and

9        10.     For such other and further relief as the court may deem just and proper.

10

11

                                       **JURY DEMAND**

12

13

     Plaintiffs Stevens demand a trial by jury on all issues in this action.

14

15

Dated: February 26 2015          LAW OFFICES OF VINCENT M. SPOHN, A.P.C.

16

17

                           By:_____

18                                      Vincent M. Spohn

                                   Attorney for Plaintiffs

19                                      RANDY STEVENS and ELISSA STEVENS

20

21

22

23

24

25

26

27

28

                                              23

## VERIFICATION

I, RANDY STEVENS, verify, under penalty of perjury, that I am one of the Plaintiffs in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Dated: February 26, 2015

RANDY STEVENS

24

COMPLAINT                                                    Case No.

**VERIFICATION**

I, ELISSA STEVENS, verify, under penalty of perjury, that I am one of the Plaintiffs in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Dated: February 26 2015
(ES)

ELISSA STEVENS

25

# EXHIBIT A

## ASSET PURCHASE AGREEMENT BETWEEN AMERICAN OIL CHANGE CORPORATION
## AND RANDY AND ELISSA STEVENS

### Table of Contents

1. PARTIES AND DATE. ...............................................................................................1

2. RECITALS ...........................................................................................................1

3. DEFINITIONS. .......................................................................................................1

4. SALE AND TRANSFER OF ASSETS, INSTRUMENTS OF TRANSFER.........................5

5. NO ASSUMPTION OF LIABILITIES OR OBLIGATIONS. .........................................5

6. CONSIDERATION AND PAYMENT. ........................................................................5

7. AREA DEVELOPMENT AGREEMENT, EXCLUSIVE AREA .......................................6

8. REPRESENTATIONS OF SELLER.............................................................................7

9. REPRESENTATIONS OF PURCHASER. ....................................................................9

10. SURVIVAL OF REPRESENTATIONS. .....................................................................10

11. INDEMNITIES. ....................................................................................................10

12. INSPECTIONS AND AUDITS BEFORE CLOSING. ...................................................11

13. CONTINUANCE OF BUSINESS..............................................................................11

14. CONTINGENCIES..................................................................................................11

15. POST-CLOSING RESPONSIBILITIES. .....................................................................12

16. NOTICES. ............................................................................................................12

17. MISCELLANEOUS. ...............................................................................................14

******

### 1.     PARTIES AND DATE.

This Asset Purchase Agreement ("Agreement") is dated as of _Dec.   19_____, 1996, by and among American Oil Change Corporation, a Delaware corporation ("Seller") and Randy and Elissa Stevens ("Purchaser").

### 2.     RECITALS

2.1     Seller currently owns, operates and/or manages the Centers.

2.2     Seller desires to sell to Purchaser and Purchaser desires to acquire from Seller, all of the Assets of Seller associated with the Centers, upon the terms and conditions hereinafter set forth.

### 3.     DEFINITIONS.

The following words shall have the following meanings when used in this Agreement:



(a)   "Assets" shall mean all of the rights and assets of the Seller which are used or usable in, or relate to, the ownership or operation of the Business (as hereinafter defined), real or personal, tangible or intangible, without regard to whether such rights or assets are reflected on Seller's financial statements or books, but specifically excluding i) accounts receivable; ii) cash on hand in excess of $250.00 per center and in bank accounts; iii) stocks, bonds and other passive investments; iv) any obligations of officers of Seller to Seller; v) tax refunds; vi) life insurance; vii) the corporate seal, minute book, charter documents, stock records and tax and similar financial records.  The word "Assets" includes but is not limited to the following:

   (i)    all physical assets used in the conduct of the Business, including but not limited to machinery and equipment, tools, all of the Inventory located at the Centers at the execution date of this Agreement, less Inventory sold in the ordinary course of business prior to the Effective Date, office equipment and supplies, furniture and furnishings, fixtures, telephone and other communication systems, cleaning equipment, lawn and building maintenance equipment, computer hardware and software, televisions, video cassette players, security and alarm systems, and other equipment of every kind and description and any rights that Seller may have with regard to any real property at which the Centers are located; and

   (ii)   all intangible property and such contract rights as are specifically assumed herein, trademarks, trade secrets, patents, patent applications, permits, licenses, agreements and rights associated with the Business or used in the conduct of the Business at the Centers; and

   (iii)  all of the Records.

The term "Assets" does not include the Franchise Agreements, the Leases or deposits Seller has paid to any utility company in connection with utility service at any of the Centers.  At any time after Closing, Seller may apply to any such utility company for a refund of any such deposit.

(b)   "Business" shall mean all operations and arrangements relating to the operation of the convenient oil change and lubrication business heretofore conducted by Seller at the Centers.

(c)   "Center" shall mean one of the Jiffy Lube service centers identified by street address on Schedule 3(c) to this Agreement.

(d)   "Closing" shall mean the events which take place for the purpose of consummation of this Agreement, the same to occur at the office of a title insurance company selected by Purchaser on _____ JAN    6 _____, 19 97, or at such other time and place to which the parties agree.

(e)   "Effective Date" shall mean 11:59 p. m., P.S. T., JAN   9 ____, 19 97.

(f)     "Franchise Agreement" shall mean a Franchise Agreement between the Purchaser and Jiffy Lube International, Inc. (JLI), in the form set forth in Exhibit 3(f)(1) (free-standing) and Exhibit 3(f)(2) (Sears Auto Center), in which Purchaser is licensed by JLI to operate a Center or other location as a Jiffy Lube service center.

(g)     "Hazardous Substances" shall mean all materials subject to regulation as a hazardous substance, hazardous waste or other substance (such as petroleum hydrocarbons) the presence of which may require remediation under the Clean Air Act (42 U.S.C. §§ 7401 *et seq.*), Clean Water Act (33 U.S.C. §§ 1251 *et seq.*), Comprehensive Environmental Response, Compensation, and Liability Act (commonly known as "Superfund" or "CERCLA") (42 U.S.C. §§ 9601 *et seq.*), the Resource Conservation and Recovery Act (commonly known as the Solid Waste Disposal Act or "RCRA") (42 U.S.C. §§ 6901 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. §§ 11001 *et seq.*), the Toxic Substances Control Act (15 U.S.C. §§ 2601 *et seq.*), any comparable state or local law, and any other applicable federal or state or local laws now in force relating to hazardous substances, hazardous wastes or other regulated substances, in each ease as amended to date. "Hazardous Substances" includes, but is not limited to asbestos, polychlorinated biphenyls (sometimes called "PCB's"), lead-based paints, any petroleum products, including crude oil or any fraction of it, and any natural gas, natural gas liquids, synthetic gas, and liquefied natural gas.

(h)     "Inventory" shall mean new, resalable goods and/or materials which are located at the Centers as of the Effective Date and which are either held for resale (*e.g.*, automotive filters, packaged motor oil, etc.) or used in the course of performing a service offered at the Center to consumers (*e.g.*, bulk motor oil, greases, etc.), excluding goods and/or materials which the parties agree are damaged.

(i)     "Inventory Adjustment" shall mean an amount equal to the aggregate value of i) the Inventory at Center #1340 in excess of $15,000.00 plus ii) the Inventory at Center #1590 in excess of $10,600.00, all as of the Effective Date. For purposes of this Agreement, the value of the Inventory as of the Effective Date shall be determined by a physical inventory of the Centers conducted by representatives of Purchaser and Seller at or about the time of the Closing, and the value of the Inventory shall be deemed to be Seller's cost of purchasing the Inventory on a last in, first out basis. The Inventory Adjustment shall be paid to Seller no later than forty-five days after Closing

(j)     "Lease" shall mean one of the leases of the real property at which a Center is located, all of which are identified on Schedule 3(j) to this Agreement. A copy of each of the Leases, including any amendments thereto, is included in Appendices 3(j) to this Agreement.

(k)     "Purchase Price" shall mean the sum of $301,394.00, as adjusted by the provisions of Paragraph 6.



(l)   "Purchaser-indemnified Claim" shall mean any loss, liability, damage, cost, expense, or claim (including but not limited to reasonable legal, attorneys' and accounting fees and expenses) based upon, arising out of, or relating to: (i) any inaccurate, untruthful, or erroneous representation, breach of a warranty, or failure to perform with respect to any of the covenants, conditions or agreements of Purchaser set forth in this Agreement, any transaction contemplated in this Agreement, or any certificate or document delivered pursuant to this Agreement; (ii) any and all liabilities and obligations of, or resulting from, any action or inaction by Purchaser, including but not limited to any claim, contract, lien, security interest, encumbrance, or liability arising out of any agreement, event, or circumstance related to obligations related to the ownership or operation of the Business or the Centers after the Effective Date (including all real estate taxes, rents (including annual percentage rents), utilities and other, similar costs and expenses of owning or operating the Assets or the Leases which relate to the period after the Effective Date, prorated on a *per diem* basis); and (iii) any obligation to the United States or to any other taxing authority for taxes accrued or otherwise relating to some aspect of the Business or the Centers after the Effective Date.

(m)   "Records" shall mean all papers and records pertaining to the Business which are of a type normally maintained at the Centers, including any written technical specifications concerning inventory monitoring and/or other systems intended to monitor the integrity of any storage tanks located at the Centers.

(n)   "Seller-indemnified Claim" shall mean any loss, liability, damage, cost, expense, or claim (including but not limited to reasonable legal, attorneys' and accounting fees and expenses) based upon, arising out of, or relating to: (i) any inaccurate, untruthful, or erroneous representation, breach of a warranty, or failure to perform with respect to any of the covenants, conditions or agreements of Seller set forth in this Agreement, any transaction contemplated in this Agreement, or any certificate or document delivered pursuant to this Agreement; (ii) any and all liabilities and obligations of, or resulting from, any action or inaction by Seller, including but not limited to any claim, contract, lien, security interest, encumbrance, or liability arising out of any agreement, event, or circumstance related to obligations related to the ownership or operation of the Business or the Centers prior to the Effective Date [including any Seller's Prorated Costs not settled in accordance with the provisions of section 6, below]; (iii) any obligation to the United States or to any other taxing authority for taxes accrued or otherwise relating to some aspect of the Business or the Centers prior to the Effective Date; and (iv) the presence of any Hazardous Substances at Center #1340 at the Effective Date.

(o)   "Seller's Prorated Costs" shall mean all real estate taxes, rents (including annual percentage rents), utilities (but not deposits paid to utility companies) and other, similar costs and expenses of owning or operating the Assets or the Leases which relate to the period on and before the Effective Date, prorated on a *per diem* basis. After Closing, Seller and Purchaser shall use their best efforts to identify any Seller's Prorated Costs not identified at Closing. To the extent that Seller is able to, and does, identify such Seller's Prorated Costs during this period, Seller shall notify Purchaser, and Purchaser shall pay such Seller's Prorated Costs. To the extent that Purchaser is able to, and does, identify such Seller's Prorated Costs during this period, Purchaser shall notify Seller, and unless Seller provides to Purchaser evidence of payment of such Seller's

Prorated Costs within five days of its receipt of Purchaser's notice, Purchaser shall pay such Seller's Prorated Costs. Any Seller's Prorated Costs which are not precisely known within thirty days after Closing shall be estimated at that time using the most current actual information available. Any overage or shortage resulting from any mistaken estimate shall be settled between the parties as soon as practically possible after accurate information becomes available.

## 4. SALE AND TRANSFER OF ASSETS, INSTRUMENTS OF TRANSFER.

Upon the terms and subject to the conditions herein set forth, in consideration of the Purchase Price, Seller agrees to sell, transfer, assign, grant, convey and deliver the Assets to Purchaser, at the Effective Date, free and clear of all mortgages, liens, security interests, pledges, charges and other encumbrances, to cause its affiliate, Jiffy Lube International of Maryland, Inc. ("JLIM"), to execute and deliver to Purchaser the Lease, free and clear of all mortgages, liens, security interests, pledges, charges and other encumbrances created by Seller or JLIM, and to cause Jiffy Lube International, Inc. ("JLI") to deliver to Purchaser a Franchise Agreement for each of the Centers.

## 5. NO ASSUMPTION OF LIABILITIES OR OBLIGATIONS.

Except for the Lease, Seller's obligations in connection with a Lube Center Sales Agreement with Pennzoil Products Company, Seller's obligations with respect to building out and operating Center #1589 and any other contracts identified in Schedule 5 to this Agreement, Purchaser has not assumed, and shall not assume, any liability or obligation of any nature, known or unknown, existing or contingent of Seller, including but not limited to any liabilities or obligations with respect to any employees of Seller. All contracts, obligations, liens, encumbrances or liabilities of Seller shall continue to be the sole responsibility of Seller, which shall honor, satisfy, and/or discharge all such contracts, obligations, liens, encumbrances and liabilities as they become due.

## 6. CONSIDERATION AND PAYMENT.

6.1    At Closing, Purchaser shall pay the Purchase Price to the order of Seller by execution and delivery of Purchaser's Promissory Note (in the form attached hereto as Exhibit 6.1, in the amount of $100,000.00, payable in full in thirty six months and accruing interest at 9% per annum), and execution and delivery of the Security Agreement in the form attached hereto as Exhibit 6.1(a), plus wire transfer of funds for the balance of the Purchase Price --

(a)    minus Seller's Prorated Costs liquidated and agreed upon at Closing;

(b)    plus the amount of any security deposits acknowledged to be held by any lessor under the Lease;

(c)    plus amounts of prepaid expenses identified and agreed upon at Closing, and described in Schedule 6.1(c) to this Agreement.

Page 5



6.2    If Pennzoil Lube Center Acceptance Corporation ("PLCAC") has issued its written loan commitment, agreeing to extend to Purchaser the funds necessary for Closing, but is not able to fund the transaction by the anticipated Closing Date, then Purchaser shall execute and deliver to Seller, and Seller shall accept, Purchaser's promissory note, in the form attached hereto as Exhibit 6.2, and in a principal amount equal to the amount of funds due Seller and JLI at Closing. Such promissory note shall be interest free, and shall be paid in full by funding out of PLCAC or by Purchaser, no later than February 5, 1997. In the event funding has not occurred by February 5, 1990, through no fault of Purchaser, then Purchaser may elect to extend repayment of the note for an additional 90 days at 9 1/2% interest per annum.

6.3    During the term of the note described in 6.1 above, if Purchaser develops any approved and licensed Jiffy Lube service centers, and pursuant to the Franchise Agreement pays that portion of the franchise fee due at execution of the Franchise Agreement, then Purchaser may elect to apply payment of the balance of the franchise fee to the balance due on that note.

## 7.    AREA DEVELOPMENT AGREEMENT, EXCLUSIVE AREA

7.1    Seller will offer to Purchaser, as soon as Seller (or JLI) is authorized to do so, an Area Development Agreement granting to Purchaser exclusive rights to develop and operate Jiffy Lube service centers in Napa and Sonoma Counties, California (the "Area") for a period of five years, and for which Purchaser shall develop and operate three new Jiffy Lube service centers during that period. During the period of time between the Effective Date of this Agreement and the offering of an Area Development Agreement (not to exceed five years), Seller shall not develop nor license or otherwise allow others to develop Jiffy Lube service centers within the Area.

7.2    Seller further hereby grants to Purchaser the following territorial protection in Marin County, California:
    For five years from the Effective Date, JLI shall advise Purchaser of any proposal by a prospective franchisee to develop a Jiffy Lube service center in Marin County. Franchisee shall then have 90 days in which to locate a suitable or better alternative site to develop, which will in JLI's opinion adequately service the area to be served by the proposed location, and to submit to JLI a site approval package in the form prescribed by JLI. JLIshall then have 30 days to approve or disapprove the site. If the site proposed by Purchaser is approved, a franchise agreement for the site is executed by Purchaser and the initial franchise fee is paid, all within 10 days of such approval, then the site proposed by the prospective franchisee will be rejected. If Purchaser does not submit a site within the 90 days, or if the site submitted is rejected, or if Purchaser fails to open the center at the site within 12 months after the date of the franchise agreement, then JLI may allow the earlier proposed development by the prospective franchisee to proceed. It is expressly understood, however, that the above provisions apply only to a prospective franchised center; JLI or Seller may develop and operate company operated centers at any location in Marin County at any time, subject only to any restrictions of the Franchise Agreements between JLI and Purchaser.

7.3    Seller further grants to Purchaser a preferential right to purchase Seller's Mill Valley (#655) and Vallejo (#803) service centers according to the terms of this subparagraph. For three

years from the Effective Date, should Seller decide to offer either or both of these service centers for sale, then Seller shall first notify Purchaser, who shall have thirty days in which to submit an offer to Seller to purchase the service center(s).  If Seller accepts Purchaser's offer, then Purchaser must close within sixty days of notice of acceptance of the offer, or the acceptance is null and void.  If Seller rejects the offer, Seller may proceed to offer the service center(s) for sale to any prospective purchasers, and shall be under no further obligation to Purchaser with respect to the service center(s), regardless of the amount of the purchase price of the eventual sale, or the failure to consummate a sale.

7.4     Seller further grants to Purchaser a right of first refusal for Seller's Mill Valley (#655) and Vallejo (#803) service centers according to the terms of this subparagraph.  For three years from the Effective Date, should Seller receive an unsolicited offer to purchase either or both of the service centers, Seller shall first offer the service centers to Purchaser under the same terms and conditions.  Purchaser shall have ten days to notify Purchaser of its election to purchase the service centers(s) under the same terms and conditions, and shall close within sixty days after his receipt of the notice of the offer from Seller, or the right to purchase shall lapse, and Seller shall have no further obligations to Purchaser with respect to the service center(s).

7.5     With respect to Marin County only, Purchaser acknowledges that Seller has made no representations with respect to future development of stores by Purchaser in that county, other than any that may be contained within this paragraph 7.  Purchaser specifically acknowledges that a condition by Seller of the approval of a prospective site by Purchaser (in addition to any other criteria in effect generally at the time of submission) may be that  no radius of protection will be granted to that location

## 8.     REPRESENTATIONS OF SELLER.

Seller hereby represents, warrants and agrees as follows:

8.1     Seller has been duly organized, and is validly existing and in good standing under the laws of the State of Delaware and is authorized to do business in the state in which the Center is located.

8.2     The execution, delivery, and performance of this Agreement have been duly authorized by the persons required to give such authorization, and Seller has the complete and unrestricted power and authority and has taken all action necessary to enter into, execute and deliver this Agreement, to perform all of its obligations hereunder, and to consummate all transactions contemplated herein.

8.3     The execution and delivery of this Agreement, performance hereunder, and the consummation of the transactions herein contemplated, do not and will not, immediately or with the passage of time, the giving of notice or otherwise, result in the breach of, constitute a default or violation under, or accelerate any obligation under any agreement or other instrument to which Seller is a party or by which Seller may be bound, so as to give or create any rights in third parties with respect to the Assets or the Lease.

8.4     Upon execution and delivery, this Agreement will be a legal, valid, and binding obligation of Seller, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

8.5     Seller has all requisite power and all necessary permits, certificates, contracts, approvals and other authorizations required by any and all federal, state, city, county or other municipal bodies to own, lease, use, and operate its properties, including but not limited to the Assets, and to conduct the Business in the manner in which the Business is presently conducted.

8.6     Seller has good and marketable title to the Assets free and clear of all mortgages, liens, security interests, pledges, charges, obligations and other encumbrances, except for the Leases. JLIM has the power to sublease or lease the property at which the Centers are located to Purchaser.

8.7     Seller is not subject to any order of any court or governmental authority, any pending or, to the best of Seller's knowledge, threatened, action, suit, proceeding, inquiry or investigation at law or in equity, or before any court, arbitrator, public board or body, wherein an unfavorable decision, ruling or finding would, in any way, adversely affect the transactions contemplated by this Agreement or the Business, the Assets, the Leases or the financial condition of Seller.

8.8     Except as provided in section 5, above, or in Schedule 5, or as described in the Franchise Agreements, there are no agreements, leases, contracts, charges, encumbrances or restrictions which may affect Purchaser's use or right to use any of the Assets or any of the Leases or which create obligations for which Purchaser is liable.

8.9 ·   Seller has maintained, and until the expiration of all applicable statutes of limitation will continue to maintain, liability insurance for any claims which may have arisen or cause of action which may have accrued during Seller's ownership and/or operation of the Business, the Assets, the Leases and the Centers.

8.10    The consents of all persons (including but not limited to governmental authorities and agencies, creditors of Seller, parties to any of the Leases, or parties to any other instruments or agreements to which Seller is a party or by which it is bound) whose approval or consent to the execution, delivery and performance of this Agreement by Seller is legally or contractually required have been duly obtained as of the date hereof, or will be obtained prior to Closing.

8.12    Schedule 8.12 attached hereto is a list of all persons employed by Seller to perform work related to the Business at the Centers as of the date of this Agreement. Schedule 8.12 accurately and completely shows the listed employees' current rates of compensation, including any bonuses, vacation and other benefits which have accrued to each employee. Seller has no written employment agreements with any of its employees which Purchaser will be required to assume and has no oral or written understandings with any of its employees which relate to terms of conditions of such employee's employment which Purchaser will be required to assume. Seller has made no promises or representations to any of its employees that Purchaser or any of its

affiliates would employ them, or would continue in effect any benefit to which they may now be entitled or believe themselves to be entitled, or would pay or grant any bonus or benefit which any employee may have accrued during his or her employment by Seller. Inclusion in this Agreement of the information set forth in Schedule 8.12 does not imply that Purchaser or any of its affiliates will continue to employ any of the individuals therein identified or, if it chooses to employ any such individual, that Purchaser or any of its affiliates will offer him or her pay or benefits comparable to those therein identified.

8.13    Seller has no pension or profit sharing plans or employee benefit plans (as that term is defined in section 3 of the federal law commonly known as the Employees' Retirement Income Security Act, as amended) for any of its employees which Purchaser or any of its affiliates will be required to assume.

8.14    To the best knowledge of Seller, there is no material contamination of the property at which the Centers are located by any Hazardous Substances other than as reflected by the information appended to this Agreement as Appendix 8.14-1

8.15    Seller has registered all oil storage tanks with any governmental office or authority requiring such registration.

8.16    In connection with its operation of the Business and ownership and use of the Assets and the Leases, Seller is not aware of any material failures to comply with any applicable local, state or federal laws, regulations, ordinances or administrative or judicial orders, including but not limited to those relating to Hazardous Substances, and no allegations have been made of any such failure.

8.17    Seller has filed or will timely file all federal, state and local tax returns required to be filed by it and has made payment or will make timely payment of all taxes shown by those returns to be due and payable.

8.18    Seller will pay all employee vacation time and accrued bonuses as of Closing.

## 9.    REPRESENTATIONS OF PURCHASER.

Purchaser represents, warrants and agrees as follows:

9.1    This Agreement and the other agreements and transactions contemplated herein to which Purchaser or any of its affiliates is or will be a party will each, upon execution and delivery be a legal, valid and binding obligation of Purchaser enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally. This Agreement does not violate any law or regulation pertaining to Purchaser and does not conflict with any other agreement affecting Purchaser.



Page 9

9.2     There are no events or circumstances existing at the date of this Agreement which may lead Purchaser to be unable to fulfill its obligations under this Agreement, the Leases or the Franchise Agreements.

## 10.     SURVIVAL OF REPRESENTATIONS.

The representations, warranties, covenants, and agreements contained in this Agreement shall survive Closing for a period of two years.

## 11.     INDEMNITIES.

11.1  Seller's indemnities.

(a)     Without limiting any of its other obligations under this Agreement, Seller agrees to, and does hereby, indemnify Purchaser and hold Purchaser harmless against and from any and all Seller-indemnified Claims, *provided* that except as provided in section (b) or (c), below, Purchaser shall promptly notify Seller of any Seller-indemnified Claim and any claim, demand, liability, suit or cause of action which, upon an unfavorable decision, ruling or finding would or could result in an Seller-indemnified Claim, and shall tender to Seller, and Seller shall assume, complete control over the defense of any Seller-indemnified Claim.  If Purchaser or any of its affiliates is named in any Seller-indemnified Claim, then (without affecting Seller's obligations to provide a defense) Purchaser may, at its own expense, retain counsel to monitor the prosecution and resolution of such Seller-indemnified Claim.

(b)     Purchaser may, but is not required to, settle any claim by any consumer related to Seller's provision of goods or services through the Effective Date, without recourse to Seller, to the extent that such claim may be settled by the provision of goods or services having a retail value of, or by the payment of, less than $250.00.

(c)     Purchaser may, but is not required to, settle any claim by any consumer related to Seller's provision of goods or services through the Effective Date, to the extent that such claim may be settled by the provision of goods or services having a retail value of, or by the payment of, $250.00 or more but less than $2,000.00, without notification to Seller, and Seller shall promptly reimburse Purchaser for the amount or retail value so paid out, *provided* that:

(i)     The vehicle with regard to which the claim is made was driven less than 500 miles before the consumer first became aware of the factual basis of the claim;

(ii)    The consumer asserts the claim within six months of the date of the service that is alleged to be the basis of the claim; and

(iii)   The Customer Service Department of Jiffy Lube International, Inc., determines in good faith that there is reasonable cause to believe



that the damage of which the consumer complains was caused by some act or omission of Seller or Seller's employee.

11.2    Purchaser's indemnities.

Without limiting any of its other obligations under this Agreement, Purchaser agrees to, and does hereby, indemnify Seller and hold Seller harmless against and from any and all Purchaser-indemnified Claims *provided* that Seller shall promptly notify Purchaser of any Purchaser-indemnified Claim and any claim, demand, liability, suit or cause of action which, upon an unfavorable decision, ruling or finding would or could result in an Purchaser-indemnified Claim, and shall tender to Purchaser, and Purchaser shall assume, complete control over the defense of any Seller-indemnified Claim.   If Seller is named in any Purchaser-indemnified Claim, then (without affecting Purchaser's obligations to provide a defense) Seller may, at its own expense, retain counsel to monitor the prosecution and resolution of such Purchaser-indemnified Claim.

## 12.    INSPECTIONS AND AUDITS BEFORE CLOSING.

12.1    Seller will allow Purchaser and Purchaser's accountants, attorneys and agents full access during normal business hours to all premises in which Seller conducts its business or which contain Assets and to all records and other material constituting a part of the Assets, with the right, at Purchaser's expense, to make copies thereof.  Seller further agrees to furnish Purchaser with such financial and operating data and other information with respect to the Assets, the Lease and the Business as Purchaser or its agents may from time to time reasonably request.

12.2    After the date of this Agreement, but before the Effective Date, Seller will allow Purchaser and Purchaser's agents reasonable opportunities during normal business hours to interview those of Seller's employees who are employed by Seller to work at any of the Centers or to perform general supervisory or clerical support for Centers in Marin, Napa and Sonoma counties, for the purpose of determining whether and if so, upon what terms to offer to employ such employees for itself.

12.3    At its own expense, Purchaser may cause its representatives to inspect the Centers and conduct such soil boring and sampling of soil and groundwater as Purchaser may deem reasonably necessary in order to determine whether any Hazardous Substance may be present.

## 13.    CONTINUANCE OF BUSINESS.

From the execution of this Agreement until the Effective Date, Seller shall operate the Business to the best of its ability, using all reasonable efforts not to cause any diminution in the value of the Business.  Seller will assist Purchaser or any party designated by Purchaser in every reasonable manner to enable Purchaser or any party designated by Purchaser to maintain and continue business relationships presently enjoyed by Seller with respect to the Assets or the Leases.

## 14.    CONTINGENCIES.



14.1   The parties' obligations under this Agreement are subject to JLIM's obtaining the consent of any prime or ground lessor to any Lease, to the extent that any existing prime or ground lease requires such consent. If this contingency fails, either party shall be entitled to terminate this Agreement and neither party shall have any obligation in connection with this Agreement.

14.2   If any audit or inspection conducted pursuant to the provisions of section 12 of this Agreement discloses a material deviation in revenues or other financial characteristic when compared to information concerning the Business heretofore provided to Purchaser by Seller, or the presence of any Hazardous Substances at a Center in any material quantity, then Purchaser may terminate this Agreement and neither party shall have any further responsibility in connection with this Agreement.

## 15.   POST-CLOSING RESPONSIBILITIES.

15.1   From time to time after Closing, and without further consideration, Seller, at Purchaser's request, will execute and deliver such further instruments of conveyance and transfer and take such other action as Purchaser may reasonably require for the transfer of the Assets.

15.2   Purchaser shall maintain the originals of the Records for a period of three years after Closing and shall make them available to Seller for inspection and/or copying at the place they are stored by Purchaser in the ordinary course of business during ordinary business hours.

15.3   After the Closing, Seller and Purchaser shall use their best efforts to identify Seller's Prorated Costs not liquidated at Closing, and shall make such payments and/or adjustments as may be necessary so that such Costs shall be borne in the manner contemplated by this Agreement.

## 16.   NOTICES.

All notices or other communications pursuant to this Agreement, or required by any statute or ordinance now or hereafter in effect, shall be in writing and given by United States registered or certified mail, return receipt requested, by personal delivery, or by facsimile (with a copy mailed, postage prepaid) as set forth below, although each party may change its address to any other location in the United States upon written notice in accordance with this paragraph. All notices or other communications shall become effective and shall be deemed to be given (a) when delivered to the appropriate address set forth below, if personally delivered; (b) three business days after mailing if mailed; or (c) the next business day after transmitted, if sent by facsimile. Until changed as provided herein, all notices and communication shall be addressed as follows:

To Purchaser:     Randy and Elissa Stevens
                  5386 Blue Ridge Trail
                  Santa Rosa, CA 95404
                  Fax: 707-542-0826

To Seller:        American Oil Change Corporation

Page 12



700 Milam Street
Houston, TX 77002
Attn.: Vice President - Legal
            Jiffy Lube International, Inc.

Fax: 713/546-6405



Page 13

## 17.    MISCELLANEOUS.

17.1    Each party covenants and agrees that it shall be responsible for and shall bear its own legal and other costs and expenses in connection with the negotiation, preparation and execution of this Agreement, and the performance of the transactions contemplated hereby.

17.2    If any provision of this Agreement is held invalid, illegal, or unenforceable under applicable law, the remainder of this Agreement shall remain valid and enforceable.  It is the intention of the parties that if any provision is held to be illegal, invalid, or unenforceable, there will be added, in lieu thereof, a legal, valid and enforceable provision as similar in terms to such provision as is possible.

17.3    This Agreement and the Exhibits, Appendices and Schedules to it contain the entire agreement among the parties hereto with respect to the sale and purchase of the Assets, and supersede all previous written or oral negotiations, commitments and writings.

17.4    If any party to this Agreement, or the successors or assigns of any party, finds it necessary to take any action to enforce any provision hereof, or to secure specific performance or to collect damages of any kind for breach of this Agreement, the prevailing party or parties will be entitled to recover from the losing party or parties its or their reasonable court costs and expenses arising out of or incurred by reason of the action, including but not limited to reasonable attorneys' fees.

17.5    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

17.6    This Agreement may be amended only in writing executed by the parties hereto affected by such amendment.

17.7    This Agreement will inure to the benefit of and bind the respective heirs, personal representatives, successors and permitted assigns of the parties hereto.  This Agreement may be assigned in whole or in part by Purchaser at any time at or prior to Closing, in which case Seller shall be required to deliver all documents of transfer to Purchaser's assignee.

17.8    Each of the parties to this Agreement represents that no person is entitled to any brokerage commission, finder's fee, or any other like payment in connection with any transaction contemplated by this Agreement, by reason of the action of any party to this Agreement.

17.9    Section headings or titles used in this Agreement are for convenience of reference only and do not constitute a limitation on the content of any part of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or caused this Agreement to be duly executed by their authorized representatives, as of the day and year set forth immediately below their or their representative's signature.

Page 14



AMERICAN OIL CHANGE
CORPORATION

By: _____

Randy Stevens

Elissa Stevens

## List of Schedules, Exhibits and Appendices

~~Schedule 3(e) (List of Centers)~~
~~Schedule 3(j) (List of Leases)~~
Schedule 5 (Contracts to be assigned to, and assumed by, Purchaser)
6.1(f) Schedule 6.1(d) (Prepaid Expenses) (to be added at Closing)
Schedule 8.12 (List of Personnel)   7 - 11
6.1(e)         (CUPA COMPLIANCE?)
~~Exhibit 3(f)(1) (Form of Franchise Agreement-Free Standing)~~
~~Exhibit 3(f)(2) (Form of Franchise Agreement-Sears Auto Center)~~
~~Exhibit 6.1 (Form of Promissory Note)~~
Exhibit 6.2 (Form of Promissory Note)
~~Exhibit 6.1(a) (Form of Security Agreement)~~

~~Appendix 3(j) (Copy of Lease)~~
Appendix 8.14 (Copy of Environmental Information)
7.13(a)
f:\groups\legal\jli\jdp96\napapa02.doc

APPENDIX
LEASE

Page 15



SCHEDULE 3(c)
LIST OF CENTERS

| CENTER # | ADDRESS |
|---|---|
| 1340 | 603 Lincoln Ave.<br>Napa, CA |
| 1590 | 9000 Northgate Mall<br>San Rafael, CA |



## SCHEDULE 3(j)

## LIST OF LEASES

| CENTER | LEASE DATE | LANDLORD |
|--------|-----------|----------|
| 1340 | 12/15/92 | USA Gasoline Corporation |



Page 17

## SCHEDULE 5

### CONTRACTS TO BE ASSIGNED TO,
### AND ASSUMED BY, PURCHASER

CONTRACT PARTY        DATE        OBLIGATION

**Pennzoil Products Company**                **Lube Center Sales Agreement**



AMERICAN OIL CHANGE
CORPORATION

By: _____

Randy Stevens

Elissa Stevens

## List of Schedules, Exhibits and Appendices

Schedule 3(c) (List of Centers)
Schedule 3(j) (List of Leases)
Schedule 5 (Contracts to be assigned to, and assumed by, Purchaser)
Schedule 6.1(d) (Prepaid Expenses) (to be added at Closing)
Schedule 8.12 (List of Personnel)

Exhibit 3(f)(1) (Form of Franchise Agreement-Free Standing)
Exhibit 3(f)(2) (Form of Franchise Agreement-Sears Auto Center)
Exhibit 6.1  (Form of Promissory Note)
Exhibit 6.2  (Form of Promissory Note)
Exhibit 6.1(a)  (Form of Security Agreement)

Appendix 3(j) (Copy of Lease)
Appendix 8.14 (Copy of Environmental Information)

f:\groups\legal\jll\jdp96\napapa02.doc

APPENDIX
LEASE



Page 15

**EXHIBIT B**

1996 FRANCHISE AGREEMENT

**EXHIBIT 3(f)1**
**FORM OF FRANCHISE AGREEMENT - FREE STANDING**

# JIFFY LUBE INTERNATIONAL, INC.

# FRANCHISE AGREEMENT

# with

# RANDY & ELISSA STEVENS

**STORE #1340**
**REAL ESTATE #2518**

F:\GROUPS\DVLPMNT\FRANCHIS\ZEES\STEVEN-1\96FA.DOT



# Table of Contents

1. PARTIES AND DATE ...................................................................................1
2. RECITALS AND ACKNOWLEDGMENTS ..............................................1
3. GRANT OF FRANCHISE .............................................................................2
4. TERM AND RENEWAL ...............................................................................4
    *4.1 Initial term.* ...............................................................................................4
    *4.2 Renewal terms* .........................................................................................4
5. PROPRIETARY MARKS AND TRADE SECRETS...................................6
    *5.1 The Proprietary Marks.* ..........................................................................6
    *5.2 Trade secrets.* ...........................................................................................8
    *5.3 Ownership of ideas concerning the System.* ..........................................9
6. FRANCHISE FEE, ROYALTIES AND OTHER FEES.............................9
    *6.1 Franchise fee* ...........................................................................................9
    *6.2 Royalties* ................................................................................................10
    *6.3 Additional royalty* ................................................................................11
    *6.4 Service charge.* ......................................................................................11
    *6.5 Fleet Credits and Debits* .......................................................................11
    *6.6 Taxes.* ....................................................................................................12
7. LOCATION OF THE SERVICE CENTER ...............................................12
    *7.1 When Jiffy Lube owns or controls the site.* ...........................................12
    *7.2 When Jiffy Lube does not own or control the site; site identification.* .......12
    *7.3 When Jiffy Lube does not own or control the site; site acquisition.* ..........14
    *7.4 Extensions of time* ................................................................................14
8. BUILDING AND OPENING THE FRANCHISED CENTER .................14
    *8.1 Standard plans; appearance of the Franchised Center.* ..........................14
    *8.2 Permits.* ................................................................................................15
    *8.3 Construction and opening.* ....................................................................15
    *8.4 Signs.* ....................................................................................................15
    *8.5 Existing Service Centers* ........................................................................15
    *8.6 Effect of failure to locate an approved Service Center site.* .....................16
    *8.7 Extensions of time.* ...............................................................................16
9. TRAINING ..................................................................................................16
    *9.1 Operations training course for managers.* ............................................16
    *9.2 Training for initial employees of the Franchised Center.* .......................18
    *9.3 Other training* .......................................................................................18
10. POINT OF SALE COMPUTER SYSTEM ...............................................18
    *10.1 Initial POS hardware.* ..........................................................................18
    *10.2 POS Software* .......................................................................................19
        10.2.1 Delivery. ...................................................................................19
        10.2.2 License. .....................................................................................19
        10.2.3 Restrictions on copying. ...........................................................19



Table of Contents, continued

10.2.4 Communication of restrictions......................................19
10.2.5 Prohibition of unauthorized use...................................20
10.2.6 Copyright. .................................................................20
10.2.7 Limited Warranty. .....................................................20
10.2.8 Disclaimer of other warranties..................................21
10.2.9 Possible warranty rights under state law. ...................21
10.2.10 Indemnification. ......................................................21
10.2.11 Disclaimer of consequential damages......................22
10.2.12 Possible right to damages under state law...............22
10.2.13 Technical support.....................................................22
10.2.14 POS Software maintenance.....................................23
10.2.15 Service limitations....................................................23
10.2.16 Media distribution. ..................................................24
10.2.17 No unauthorized use or alteration of the POS Software......24
10.2.18 No implied assistance or documentation. ...............24
10.3 Costs associated with the POS system. ...........................24
10.4 Operation of the POS system. .......................................25
10.5 Changes in the POS system...........................................25
10.6 Restriction on provision of unique POS characteristics to others............25
11. ACCOUNTING PROCEDURES.........................................25
12. OPERATION OF THE FRANCHISED CENTER .................27
12.1 Supervision by a trained manager..................................27
12.2 The Manual and the System Manuals..............................27
12.3 Approved products and supplies.....................................28
12.4 Maintenance of the Franchised Center............................28
12.5 Retail pricing. ...............................................................29
12.6 Hours of operation. .......................................................29
12.7 Prohibited activities. .....................................................29
12.8 Inspections by Jiffy Lube...............................................30
13. ADVERTISING.................................................................30
13.1 Minimum expenditure on advertising. .............................30
13.2 Formation of a Coöperative............................................31
13.3 Approval of advertising by Jiffy Lube...............................32
13.4 Advertising materials provided by Jiffy Lube.....................32
14. TRANSFERABILITY OF INTERESTS...................................32
14.1 Transfer by Jiffy Lube.....................................................32
14.2 Transfer by the Franchisee.............................................33
14.3 Transfer to the Franchisee's corporation or partnership. .......37
14.4 Transfer and issuance of securities..................................37
14.5 Jiffy Lube's right of first refusal......................................38
14.6 Transfer to a member of the immediate family. ................39
14.7 Transfer upon death or permanent incapacity..................39



Table of Contents, continued

14.8 *Non-waiver of claims.* ............................................................................................40
15. INSURANCE ......................................................................................................40
16. HOLD HARMLESS ...........................................................................................41
17. DEFAULT AND TERMINATION ......................................................................42
17.1 *The Franchisee's bankruptcy and related matters.* ........................................42
17.2 *Termination without opportunity to cure by the Franchisee.* ........................42
17.3 *The Franchisee's opportunity to cure certain defaults.* ..................................43
17.4 *Defaults under other agreements or arrangements.* ......................................44
17.5 *Defaults by Jiffy Lube.* .................................................................................45
18. OBLIGATIONS UPON EXPIRATION OR TERMINATION ..................45
19. COVENANTS NOT TO COMPETE ...................................................................46
19.1 *"In term" covenants.* .....................................................................................47
19.2 *"Post term" covenants.* .................................................................................47
19.3 *Covenants from others.* .................................................................................48
19.4 *Consent to injunctive relief.* .........................................................................48
19.5 *Construction.* ...............................................................................................48
19.6 *Permitted ownership of publicly traded corporations.* ..................................49
20. MISCELLANEOUS .............................................................................................49
20.1 *The Franchisee is an independent contractor.* .............................................49
20.2 *Compliance with law.* ...................................................................................49
20.3 *Effect of partial invalidity.* ...........................................................................50
20.4. *Waiver and estoppel.* ...................................................................................50
20.5 *Time.* .............................................................................................................50
20.6 *Interpretation.* ..............................................................................................50
20.7 *Notices.* .........................................................................................................51
20.8 *Arbitration.* ...................................................................................................51
20.8.1 Rules for arbitration ....................................................................................51
20.8.2 Claims not subject to arbitration. ...............................................................52
20.8.3 Applicability of the Federal Arbitration Act ...............................................53
20.8.4 Limitations period .......................................................................................53
20.8.5 Waiver of right to trial by jury. ...................................................................53
20.8.6 Availability of injunctive relief. ...................................................................53
20.8.7 Acknowledgment of these provisions. .........................................................54
20.9 *Entire Agreement.* .........................................................................................54
21. SIGNATURES AND DATE ................................................................................54



# FRANCHISE AGREEMENT

### 1. PARTIES AND DATE

This is an Agreement between Jiffy Lube International, Inc. ("Jiffy Lube"), and the undersigned "Franchisee," and is effective as of the date set forth in section 21 of this Agreement (the "Effective Date").

### 2. RECITALS AND ACKNOWLEDGMENTS

2.1    The Franchisee acknowledges that Jiffy Lube has spent time, money and effort developing a system for providing services to cars and light trucks using the registered trademark, "Jiffy Lube®" (the "System"). The System includes methods for locating, building and operating Jiffy Lube® service centers ("Service Centers") and methods for marketing the services offered at Service Centers. The Franchisee also acknowledges that Jiffy Lube has spent time, money and effort advertising the System and the services offered by businesses that use the System; in this way, Jiffy Lube has developed, and will continue to develop, valuable goodwill in the service mark and trade name "Jiffy Lube®" and certain other service marks, trademarks and trade names used in connection with the System and owned by Jiffy Lube (the "Proprietary Marks").

2.2    Jiffy Lube *franchises* the System. That is, Jiffy Lube authorizes independent businesses, called "franchisees," to use the System in accordance with certain rules. Jiffy Lube also gives franchisees advice and, in some cases, instructions in connection with locating, building, opening and operating Service Centers and advertising the services offered at Service Centers.

2.3    The Franchisee wishes to locate, acquire, open and operate a Service Center on the terms and conditions specified in this Agreement. The Franchisee acknowledges that the consuming public associates convenient, courteous and competent automotive service with the Proprietary Marks. The Franchisee also acknowledges that in order to maintain the goodwill and integrity associated with the Proprietary Marks, it is essential that the Franchisee strictly follow Jiffy Lube's standards for operating a Service Center, as set forth in this Agreement and in the Policies and Procedures Manual (the "Manual") which is described in section 12.2 of this Agreement.

2.4    The Franchisee acknowledges that at least ten business days before this Agreement was executed, the Franchisee received a copy of Jiffy Lube's March 1996 Uniform Franchise Offering Circular, together with the addendum (if any) required by the state in which the Franchisee resides and/or the state in which the Area (as the word "Area" is defined in section 3.2 of this Agreement) is located. The Franchisee

acknowledges that at least five business days before this Agreement was executed, the Franchisee received a copy of this Agreement in its current form. The Franchisee acknowledges that before executing this Agreement, the Franchisee has had an opportunity to review this Agreement, to discuss this Agreement and its investment in the System with lawyers, accountants or other business advisors, and to contact current and past Jiffy Lube franchisees. The Franchisee acknowledges that in entering this Agreement, it is not relying on any promise or representation other than those which are set forth expressly in this Agreement. Finally, the Franchisee acknowledges that its success in operating a Service Center is largely dependent on Franchisee's own skill and business acumen.

## 3.   GRANT OF FRANCHISE

3.1     Jiffy Lube hereby grants to the Franchisee a non-exclusive license to use the System and the Proprietary Marks in connection with the operation of a Service Center, but *only* in connection with the operation of a Service Center, according to the terms of this Agreement.

3.2     Jiffy Lube grants the Franchisee a right to locate, acquire, open and operate one Service Center in an area described in the First Addendum to this Agreement (the "Area"). (In this Agreement, the Service Center to be operated by the Franchisee is called the "Franchised Center.") After a specific site for the Franchised Center has been identified by the Franchisee and approved by Jiffy Lube pursuant to section 7.2 of this Agreement, the street address of that site will be identified in a Second Addendum to this Agreement.

3.3     The Franchisee's right to locate, acquire, open and operate a Service Center in the Area will be exclusive until the earlier of:

(a)     The date on which a specific site for the Franchised Center identified by the Franchisee is approved by Jiffy Lube pursuant to section 7.2 of this Agreement; or

(b)     The expiration of the time provided in section 7.2 of this Agreement within which the Franchisee may locate a specific site for the Franchised Center and secure Jiffy Lube's approval of that location.

After the expiration of the period described in this section 3.3, the definition of the Area will have no further relevance to this Agreement and, except as provided in section 3.4 of this Agreement, the Franchisee will have no exclusive right to operate a Service Center in the Area. The Area is defined in this Agreement only for the purpose of identifying an area in which the Franchisee has a right to locate the Franchised Center



Page 2

and not as an attempt to define any particular trading area or customer base. This Agreement does not give the Franchisee any territorial rights outside of the Area.

3.4     Subject to any rights granted by Jiffy Lube to others under the terms of any franchise agreement or development agreement existing on the date of execution of this agreement, during the term of this Agreement and after the expiration of the time provided in section 3.3 of this Agreement, Jiffy Lube will not operate or authorize anyone else to operate a Service Center within three miles of the Franchised Center (the "Three Mile Area"). The Franchisee has no rights outside of the Three Mile Area, and Jiffy Lube may, in its discretion, operate or authorize someone else to operate a Service Center outside of the Three Mile Area.

3.5     During the term of this Agreement (but only as long as Pennzoil Company owns or controls, directly or indirectly, both Jiffy Lube and Pennzoil Products Company), Jiffy Lube will cause Pennzoil Products Company not to:

3.5.1   Authorize the installation of any new "Pennzoil 10-Minute Oil Change" sign within two miles of the Franchised Center, *provided* that Pennzoil Products Company may replace such signs in the normal course of business if they were installed before the date of this Agreement; or

3.5.2   Extend new "major financing" to any free-standing quick lube center located within one mile of the Franchised Center. For purposes of this provision, "major financing" means financing substantially in excess of that generally offered by the companies owning the registered trademarks Castrol®, Quaker State®, Valvoline® and other major marketers of motor oil, and their distributors, in order to obtain the borrower's commitment to purchase that marketer's brand of motor oil (excluding financing packages made available only to franchisees of those marketers or their affiliates), and "quick lube center" means any automotive service center the primary business of which is to provide fast, convenient lubrication and fluid maintenance services.

3.6     Jiffy Lube and Pennzoil Products Company reserve the right to develop businesses other than the System franchised in this Agreement and to use any service mark, trademark or trade name other than the Proprietary Marks in connection with those other businesses, all without granting the Franchisee any right to use those other business formats, service marks, trademarks or trade names.



## 4.    TERM AND RENEWAL

4.1    *Initial term.*

The term of this Agreement begins on the Effective Date and, unless terminated earlier, expires on the earlier of:

4.1.1    the expiration of 20 years from the date the Franchised Center first opens for business as a Service Center, *provided* that if Franchisee leases or subleases the premises at which the Franchised Center is located, and if the Franchisee gives Jiffy Lube written notice at least 180 days before the term of this Agreement would otherwise expire, then Franchisee may extend the term of this Agreement for an additional period of up to one year so that the term of this Agreement will end at the same time as the term of the lease; or

4.1.2    the date on which the Franchisee loses the right to occupy the premises at which the Franchised business is located by virtue of some act over which the Franchisee has no control (*e.g.*, condemnation of the premises, or expiration of a lease in which the Franchisee has no right to renew the lease).

4.2    *Renewal terms.*

The Franchisee may renew this Agreement for two consecutive terms of ten years each, on the following conditions:

4.2.1    The Franchisee must give Jiffy Lube written notice of the Franchisee's election to renew at least six months (but not more than 12 months) before the end of the term before the renewal term;

4.2.2    Before the beginning of the renewal term, but subject to local zoning restrictions, the Franchisee must complete, to Jiffy Lube's satisfaction, the maintenance, renovation and remodeling of the Franchised Center that Jiffy Lube may reasonably require according to Jiffy Lube's then-current standards as consistently applied;

4.2.3    At the time the renewal term would begin, the Franchisee may not be in default of any provision of this Agreement or any other agreement between the Franchisee and Jiffy Lube or its subsidiaries;



4.2.4 The Franchisee may not have committed more than two defaults under this Agreement identified in notices of default received from Jiffy Lube or any of its subsidiaries (whether or not such defaults were cured) during the last five years of the term before the renewal term;

4.2.5 At the expiration of the term before the renewal term, the Franchisee must pay all monetary obligations owed by the Franchisee to Jiffy Lube and its subsidiaries;

4.2.6 At Jiffy Lube's option, the Franchisee may be required to execute the form of franchise agreement then being offered by Jiffy Lube to new franchisees, as modified to (a) delete the initial franchisee fee payable under that form of Agreement and substitute the renewal fee payable pursuant to sections 4.2.12 and 4.2.13 of this Agreement, and (b) provide for a term of ten years, with the renewal term (if any) that remains under the terms of this Agreement;

4.2.7 Any new franchise agreement Jiffy Lube might require at the time of a renewal would supersede this Agreement (or the agreement then expiring) in all respects, and its terms may differ from the terms of this Agreement (or the agreement then expiring);

4.2.8 The Franchisee acknowledges and agrees that a new franchise agreement might provide for a higher monthly royalty or a greater required advertising expenditure than are specified in the agreement then expiring, and so forth;

4.2.9 At the time the Franchisee seeks to renew this Agreement, the Franchisee must comply with Jiffy Lube's qualification requirements according to Jiffy Lube's then-current standards as consistently applied;

4.2.10 Before the expiration of the term before the renewal term, the Franchisee, its managers and its store-level employees must meet Jiffy Lube's training requirements as consistently applied;

4.2.11 At the time of the renewal (or at the time of execution of a new franchise agreement, as the case may be) the Franchisee and Jiffy Lube will execute a mutual general release of all claims against each other and their respective affiliates, officers, directors, shareholders, agents and employees, except:



(a)   claims of which either Jiffy Lube or the Franchisee has given written notice to the other party before the date of the renewal [*provided* that any such claim shall be lost and forever waived in the event such claim is not resolved or suit instituted within the earlier of (i) one year from the date of the renewal, or (ii) the expiration of the otherwise applicable statutory or contractual limitations period];

(b)   claims by Jiffy Lube for royalties, reminder mail charges, fleet account debits, computer hardware support charges and other similarly periodic, liquidated or readily calculable indebtedness arising under this or any other agreement; and

(c)   claims by the Franchisee for fleet account credits and other periodic, liquidated or readily calculable indebtedness arising under this or any other agreement;

4.2.12 The Franchisee will pay to Jiffy Lube a nonrefundable renewal fee of $10,000.00 for the first renewal term under this Agreement and $7,500.00 for the second renewal term under this Agreement; and

4.2.13 The fees described by section 4.2.12 of this Agreement will be adjusted upward in proportion to the rate of inflation from the date of this Agreement to the date of renewal, as measured by the Consumer Price Index for urban wage earners and clerical workers, U.S. city average (all items, 1967 = 100).

## 5.   PROPRIETARY MARKS AND TRADE SECRETS

5.1   *The Proprietary Marks.*

5.1.1   The Proprietary Marks are owned by Jiffy Lube. The Franchisee acknowledges that its use of the Proprietary Marks is a temporary use, that such use is permitted under a license from Jiffy Lube, and that Jiffy Lube retains all ownership both in the Proprietary Marks and in all goodwill generated by the Proprietary Marks. The Franchisee agrees to use the Proprietary Marks only in accordance with this Agreement. The Franchisee acknowledges that use of the Proprietary Marks without Jiffy Lube's written consent is an infringement of Jiffy Lube's rights in the Proprietary Marks. The Franchisee will not use the Proprietary Marks in any way that is not authorized by Jiffy Lube. The Franchisee will not



contest, or help anyone else to contest, the validity of the Proprietary Marks or Jiffy Lube's ownership of the Proprietary Marks.

5.1.2   The Franchisee will not use the Proprietary Marks or any name confusingly similar to the Proprietary Marks as part of the Franchisee's firm or corporate name.

5.1.3   If the Franchisee (or, if the Franchisee is a corporation, any officer or director of the Franchisee) becomes aware of any use of any of the Proprietary Marks or any mark that is confusingly similar to any of the Proprietary Marks by any person or entity other than Jiffy Lube or its affiliates or franchisees, then the Franchisee will promptly notify Jiffy Lube of such use.

5.1.4   If the Franchisee is sued by anyone who claims any right to any of the Proprietary Marks, then the Franchisee will notify Jiffy Lube promptly of that litigation. Jiffy Lube will hold harmless and indemnify the Franchisee and its officers, directors, shareholders, agents and employees, against all claims for patent or service mark infringement arising out of the Franchisee's use of the Proprietary Marks in a manner consistent with the license granted by this Agreement, provided Franchisee notifies Jiffy Lube in writing within 30 days after learning of the claim and provided Jiffy Lube has the right to control any litigation or adversary proceeding resulting from such claim.

5.1.5   From time to time during the term of this Agreement, Jiffy Lube may modify the Proprietary Marks or substitute other service marks, trade names or other commercial symbols for the Proprietary Marks as part of the System, and may require use of such modified or substituted service marks, trade names or other commercial symbols by the Franchisee.

5.1.6   Franchisee will post a sign with substantially the following notice in a conspicuous location at the Franchised Center:

> This service center is owned and operated by ___*[the Franchisee's name]*___, a franchisee of Jiffy Lube International, Inc. The trademarks "Jiffy Lube" and the "'J' and Arrow" design are owned by Jiffy Lube International, Inc. All rights reserved.



5.2     *Trade secrets.*

5.2.1   The Franchisee acknowledges that during its relationship with Jiffy Lube it will acquire knowledge of trade secrets, confidential information, know-how, sales formulae, organizational and operational methods and other information concerning the System and the operation of a Service Center. The Franchisee will treat as confidential all information designated by Jiffy Lube to be confidential ("Confidential Information"); the Manual and any additional manuals developed by Jiffy Lube and concerning particular phases of the System ("System Manuals") (including the "User Manual" described in section 10.2.13 of this Agreement) are Confidential Information without any separate designation of confidentiality being made by Jiffy Lube.

5.2.2   The Franchisee will not use or allow use of any Confidential Information except in connection with the operation of the Franchised Center and the Franchisee's Jiffy Lube business.

5.2.3   The Franchisee may disclose Confidential Information to individuals actively involved in the operation or management of the Franchised Center or the Franchisee's Jiffy Lube business, but must limit such disclosures to those individuals who reasonably need to know the Confidential Information in order to discharge their responsibilities for the Franchisee. The Franchisee will instruct any individual to whom any Confidential Information is disclosed that the information is confidential and may not be disclosed to others.

5.2.4   The Franchisee will store Confidential Information in a reasonably secure place and may not allow any Confidential Information to be photocopied or distributed to others without Jiffy Lube's permission.

5.2.5   If any Confidential Information is relevant to any administrative or judicial proceeding to which the Franchisee is a party, the Franchisee must notify Jiffy Lube as soon as practically possible that it may be required to disclose Confidential Information in order to protect its or Jiffy Lube's interests or to comply with an order of a court or administrative body. In such a case, the Franchisee must use all reasonable efforts to obtain an order from the court or administrative body before which the matter is pending, requiring the parties to such matter to keep the Confidential Information confidential.



5.2.6   The Franchisee will not be deemed to have breached the provisions of this section 5 if the Franchisee has otherwise complied with its provisions, but material designated by Jiffy Lube as Confidential Information is disclosed by reason of (a) theft or other wrongful activity by an employee of the Franchisee (other than an officer or director of the Franchisee), (b) the acts or omissions of someone other than the Franchisee or any of its officers, directors or employees, or (c) an order by a court or administrative body.

5.3   *Ownership of ideas concerning the System.*

If, during the term of this Agreement, the Franchisee or any of its officers, directors or employees develops any idea or invention that can be used in conjunction with the System and that may be copyrighted, patented or registered as a trademark, then the Franchisee will execute, or will cause its officer, director or employee to execute, an assignment of that idea or invention to Jiffy Lube, giving Jiffy Lube complete ownership of the idea or invention.

## 6.   FRANCHISE FEE, ROYALTIES AND OTHER FEES

6.1   *Franchise fee.*

6.1.1   ~~If the Franchised Center has not been operated for at least one year as a quick lube service center before execution of this Agreement, then the Franchisee will pay Jiffy Lube a franchise fee of $35,000.00, of which $10,000.00 is earned by Jiffy Lube and due upon the Franchisee's execution of this Agreement and, unless this Agreement is terminated earlier, the remaining $25,000.00 is earned by Jiffy Lube and due on the 15th day of the month after the month in which the Franchised Center opens for business.~~

6.1.2   ~~If, at the time this Agreement is executed, the Franchised Center has been in continuous operation for at least one year as a quick lube service center under some trade name other than "Jiffy Lube" (a "Converted Center"), then upon execution of this Agreement Jiffy Lube will have earned and the Franchisee will pay Jiffy Lube a franchise fee of $17,500.00.~~

6.1.3   If the Franchisee has permanently closed a Service Center with Jiffy Lube's consent more than five years before the expiration of the initial term of the Franchise Agreement or License Agreement pursuant to which that Service Center was operated, and if Jiffy Lube has accepted the Franchised Center as a replacement for such permanently closed Service Center, then



Jiffy Lube will have earned and the Franchisee will pay a relocation fee of $7,500.00 upon execution of this Agreement.

6.1.4   Notwithstanding sections 6.1.1 and 6.1.2 of this Agreement, if the Franchisee is a party to an area development agreement with Jiffy Lube which (a) is in effect when this Agreement is executed and (b) provides for some lower franchise fee or some other time for payment than is described in this section 6, then the provisions of that area development agreement will supersede this section 6 with regard to the amount and time of payment of the franchise fee.

6.2   *Royalties.*

6.2.1   The Franchisee will pay Jiffy Lube a monthly royalty equal to five percent of the "Gross Sales" (as defined in section 6.2.2 of this Agreement) at the Franchised Center. Royalty payments are due on the 15th day of the month after the month in which the Franchised Center opens for business and thereafter on the 15th day of each month, based on Gross Sales for the preceding month. If (a) the Franchisee is current on all of its obligations to Jiffy Lube and Jiffy Lube's affiliates, and (b) the monthly royalty is received at a lockbox designated by Jiffy Lube, or wire transferred to an account designated by Jiffy Lube, on or before the date on which it is due (that is, the 15th of a given month), then the Franchisee may deduct from its royalty payment a prompt payment discount equal to one percent of the Gross Sales of the Franchised Center for the preceding month.

6.2.2   For purposes of this Agreement, the term "Gross Sales" means all receipts of the Franchisee for services provided and/or goods sold at the Franchised Center, including payments (a) in cash, (b) by credit or debit card or (c) in barter transactions, without any deduction for costs incurred by the Franchisee in connection with operation of the Franchised Center. (In the case of barter transactions, the fair market value of goods or services received by the Franchisee in exchange for goods and services provided by the Franchisee is to be included in the Franchised Center's Gross Sales.)

6.2.3   Notwithstanding the provisions of section 6.2.2 of this Agreement, the Franchised Center's Gross Sales do not include (a) the amount of any sales taxes or similar taxes based on sales collected by Franchisee from consumers and paid by Franchisee to the taxing authority, (b) any *bona fide* refunds to consumers, (c) cash discounts from the usual price for goods or



services offered at the Franchised Center, or (d) the proceeds of sales of used motor oil or other recovered fluids and materials.

6.3    *Additional royalty.*

Together with its royalty payment, beginning on the 15th day of the month after the month in which the Franchised Center opens for business and thereafter on the 15th day of each month, the Franchisee will pay Jiffy Lube a fee specified from time to time by Jiffy Lube but which shall not exceed an amount calculated by increasing $60.00 on March 30, 1992, by the annual increase in the unadjusted Producer Price Index for finished goods.

6.4    *Service charge.*

If any payment to Jiffy Lube, a regional advertising coöperative association (as described in section 13 of this Agreement), or a subsidiary of Jiffy Lube are not received by the entity to which the payment is due (a "Creditor") on or before the date on which the payment is due, then in addition to any other rights or remedies the Creditor may have, the past due amount will bear interest from the due date until paid at the lesser of (a) two percent per month, or (b) the highest rate of interest allowed by law. Any late payments received by a Creditor may be applied, in the discretion of the Creditor, first to reduce the accrued interest and next the principal amount.

6.5    *Fleet Credits and Debits.*

6.5.1  As used in this Agreement, the term "Fleet Credits" refers to amounts to which the Franchisee may be entitled from Jiffy Lube as a consequence of the Franchisee's having provided goods or services to a consumer with a fleet of vehicles with which Jiffy Lube has a credit arrangement (a "Fleet Customer"), subject to processing charges imposed by Jiffy Lube and specified by Jiffy Lube from time to time. A Fleet Credit is considered to be "due to the Franchisee" 30 days after the Franchisee has submitted adequate documentation to Jiffy Lube to enable Jiffy Lube to invoice a Fleet Customer; Jiffy Lube will specify each Fleet Customer's documentary requirements to the Franchisee electronically or in writing from time to time during the term of this Agreement. A "Fleet Debit" is a reversal of a Fleet Credit previously granted in cases in which, for example, a Fleet Credit was mistakenly granted, or a Fleet Customer declines to pay an invoice for a reason Jiffy Lube determines to be reasonable.



6.5.2   Jiffy Lube may apply fleet credits owed to the Franchisee, without notice, to reduce current and past due amounts owed by the Franchisee to Jiffy Lube and its affiliates.

6.5.3   If the Franchisee maintains a credit balance on its account for two consecutive months, and if that credit balance is greater than $250.00, then within ten days of Jiffy Lube's receipt of a written request for payment from the Franchisee, Jiffy Lube will pay the amount of the credit balance to the Franchisee by check or electronic transfer of funds.

6.6   *Taxes.*

The Franchisee will pay any taxes or related interest or penalties imposed by any taxing authorities on any fees, royalties or other charges collected by Jiffy Lube from the Franchisee pursuant to this Agreement or otherwise, *provided* that the Franchisee will not be required to pay any taxes based on Jiffy Lube's income or net worth.

## 7.   LOCATION OF THE SERVICE CENTER

7.1   *When Jiffy Lube owns or controls the site.*

If Jiffy Lube or one of its affiliates owns, or is the prime lessee of, the site of the Franchised Center, then the Franchisee will enter into a lease or sublease of such premises with Jiffy Lube or its affiliate (as the case may be), and the Second Addendum to this Agreement identifying the specific site of the Franchised Center will be executed contemporaneously with this Agreement.

7.2   *When Jiffy Lube does not own or control the site; site identification.*

If neither Jiffy Lube nor any of its affiliates owns, or is the prime lessee of, the site of the Franchised Center or the improvements located at the Franchised Center, then:

7.2.1   The Franchisee agrees to identify a specific site in the Area at which the Franchised Center can be located. Within 90 days of the date of this Agreement, the Franchisee will submit to Jiffy Lube (a) a site acceptance package ("SAP") in a form prescribed by Jiffy Lube, identifying the site proposed for the Franchised Center and describing relevant demographic and cost factors concerning the site and (b) a copy of the contract to purchase or lease the site which may be contingent on (i) Jiffy Lube's approval of the site, (ii) the Franchisee's obtaining all required zoning and/or building permits (iii) obtaining necessary financing and/or (iv)



negotiation of and agreement upon the terms of such contract to purchase or lease the site.

7.2.2 Within approximately 30 days of Jiffy Lube's receipt of all of the information required in section 7.2.1 of this Agreement, together with any other information reasonably required by Jiffy Lube, Jiffy Lube will determine whether to approve the site for development as the Franchised Center and will notify the Franchisee of its determination.

7.2.3 If Jiffy Lube notifies the Franchisee of its determination not to approve a site, or if Jiffy Lube approves a site, but a permitted contingency fails, then the Franchisee will have the greater of (a) 30 days from the date of the Franchisee's receipt of notice of an adverse determination by Jiffy Lube or of the failure of a permitted contingency or (b) the expiration of 90 days from the date this Agreement is executed, within which to provide a SAP concerning another site together with a copy of the contract to purchase or lease the site which, again, may be contingent on Jiffy Lube's approval of the site or on Franchisee's obtaining all required zoning or building permits and necessary financing, but will be subject to no other conditions. Within approximately 30 days of Jiffy Lube's receipt of the SAP for the second site, together with any other information reasonably required by Jiffy Lube, Jiffy Lube will determine whether to approve that site for development as the Franchised Center and will notify the Franchisee of its determination. If the second site is not approved or if a permitted contingency with regard to the second site fails, and if no more than 90 days have elapsed since the date of this Agreement, the Franchisee may submit a third SAP and other relevant information, in the same manner and on the same terms as with regard to the second site; the Franchisee may submit no more than three SAP's in total.

7.2.4 Jiffy Lube may not unreasonably withhold its approval of any site in the Area which is presented by the Franchisee, provided, however, that approval of a site may be withheld based on demographic or other characteristics from which Jiffy Lube reasonably concludes that a service center located at such a site is not likely to be successful, or based on Jiffy Lube's sole determination that a Service Center at such a site might unreasonably adversely impact a Jiffy Lube service center existing or planned at the time the approval is sought (this provision is not intended to, and does not, give any rights to any person other than Jiffy Lube, and does not give the Franchisee any rights with regard to the area surrounding the Franchised Center in addition to those rights granted in sections 3.4 and 3.5 of this Agreement).



7.3     *When Jiffy Lube does not own or control the site; site acquisition.*

The Franchisee will acquire a lease or fee interest in the approved site and provide Jiffy Lube with a copy of the lease or purchase contract within 30 days after the later of (a) the Franchisee's receipt of notice of Jiffy Lube's approval of a site submitted to Jiffy Lube pursuant to section 7.2 of this Agreement, or (b) satisfaction of all permitted contingencies in the Franchisee's contract to purchase or lease such site.

7.3.1   If the Franchisee owns or has acquired a fee interest in a site, then within 30 days of the later of (a) such acquisition or (b) execution of this Agreement, the Franchisee will execute an option agreement giving Jiffy Lube the right, but not an obligation, to purchase or lease such site and improvements located at such site upon termination or expiration of this Agreement.

7.3.2   If the Franchisee has acquired a lease interest in a site or improvements located at such site from a party other than Jiffy Lube or one of its affiliates, then within 30 days of the later of (a) execution of such lease or (b) execution of this Agreement, the Franchisee will execute, and will cause its lessor to execute, a contingent assignment and assumption agreement giving Jiffy Lube the right, but not an obligation, to assume the Franchisee's rights and obligations in connection with such lease upon termination or expiration of this Agreement.

7.4     *Extensions of time.*

The period of time in which the Franchisee must perform any act required by this section 7 may be extended if, in Jiffy Lube's sole discretion, Jiffy Lube determines that the Franchisee has been acting in good faith and with reasonable diligence in attempting to perform the act required. Any such extension of time must be in writing and must be signed by a vice president of Jiffy Lube in order to be binding.

## 8.     BUILDING AND OPENING THE FRANCHISED CENTER

8.1     *Standard plans; appearance of the Franchised Center.*

Jiffy Lube will provide standard plans and equipment specifications for the construction of a Service Center; however, before having the Franchised Center built, the Franchisee will arrange for such building plans and equipment specifications to be modified by a person authorized to make such modifications under local ordinances or regulations in order to satisfy applicable building code requirements and/or other local requirements.

The Franchisee acknowledges that the design and appearance of the Franchised Center are part of the System and that uniformity within the System is essential to the System's success. Therefore, the Franchisee agrees that it will make no change to the exterior elevations or floor plan specified in Jiffy Lube's standard building plans or designs without Jiffy Lube's written consent before construction begins.

8.2    *Permits.*

After site approval by Jiffy Lube, the Franchisee will diligently pursue all necessary zoning and/or building permits. The Franchisee is responsible for securing all permits and other governmental approvals necessary for construction and operation of the Franchised Center. At Jiffy Lube's request, the Franchisee will give Jiffy Lube a copy of the actual city-approved site plan showing easements, access and building position, a copy of the city-approved building plans and design, and a copy of any soils report prepared by or for the Franchisee.

8.3    *Construction and opening.*

The Franchisee will cause construction of the Franchised Center to begin within 30 days after the Franchisee obtains all permits required to begin construction. During construction of the Franchised Center, the Franchisee will install a free-standing sign designating the site to be the site of a Jiffy Lube service center in a form, size and style approved in writing by Jiffy Lube. Construction will be sufficiently complete for a certificate of occupancy to be issued within four months of groundbreak. In any event, the Franchisee will open the Franchised Center within 12 months after the date of this Agreement.

8.4    *Signs.*

The Franchisee agrees to purchase or lease and to display at the Franchised Center signs, emblems, logos, lettering and pictorial materials, both attached to the Franchised Center building and free-standing, that conform to Jiffy Lube's then-current specifications, with only those modifications to which Jiffy Lube agrees in order to meet requirements of local sign ordinances. The Franchisee may not display signs, emblems, logos, lettering or pictorial materials not approved by Jiffy Lube, in writing, both as to specifications and placement.

8.5    *Existing Service Centers.*

If the Franchised Center is an existing Service Center acquired by the Franchisee from Jiffy Lube or from another franchisee of Jiffy Lube, the Franchisee will begin operation of the Franchised Center no later than the date of this Agreement. If the Franchised

Page 15

Center is a Converted Center, the Franchisee will complete all remodeling of, and installation of new interior and exterior signs at, the Franchised Center necessary to conform to Jiffy Lube's then-current standards within 60 days of the date of this Agreement.

8.6     *Effect of failure to locate an approved Service Center site.*

If this Agreement is terminated because of a failure to locate an approved site within the time provided by section 7.2 of this Agreement, or to acquire and open the Franchised Center within the time provided by this section 8, Jiffy Lube may offer a franchise for the Area or any site within the Area (including sites which may have been under consideration by the Franchisee) to any other franchisee, all without liability to the Franchisee.

8.7     *Extensions of time.*

The period of time in which the Franchisee must perform any act required by this section 8 may be extended if, in Jiffy Lube's sole discretion, Jiffy Lube determines that the Franchisee has been acting in good faith and with reasonable diligence in attempting to perform the act required. Any such extension of time must be in writing and must be signed by a vice president of Jiffy Lube in order to be binding.

## 9.     TRAINING

9.1     *Operations training course for managers.*

9.1.1     Jiffy Lube will offer an operations training course for Service Center managers, having a duration and content Jiffy Lube may determine. Jiffy Lube's operations training course will be offered in the metropolitan area in which Jiffy Lube maintains its principal place of business (as of the date of this Agreement, Jiffy Lube maintains its principal place of business in Houston, Texas). Jiffy Lube will pay for instructors, classroom facilities, training manuals and other, similar costs associated with its operations training course, *provided* that if Jiffy Lube holds and the Franchisee or its managers attend a session of Jiffy Lube's operations training course in some area other than the area in which Jiffy Lube's principal place of business is located, then the Franchisee may be required to pay a share of the cost of renting classroom space and the instructors' travel expenses in the same proportion as the number of individuals representing the Franchisee bear to all attendees of that session. The Franchisee will pay all costs associated with its or its employees' salaries or wages while attending Jiffy Lube's operations training course, as well those



Page 16

individuals' transportation, meals, lodging and incidental personal expenses while attending the course.

9.1.2   Before the Franchised Center is opened for business, the Franchisee's initial managers (and the Franchisee, if the Franchisee is an individual, or the Franchisee's officers who are responsible for operation of the Franchised Center) must successfully complete Jiffy Lube's operations training course for Service Center managers.

9.1.3   Any person employed by the Franchisee as manager of the Franchised Center after the Franchisee's initial managers will attend and complete Jiffy Lube's operations training course before assuming any duties as manager.

9.1.4   Before attending Jiffy Lube's operations training course for managers, an individual (a) must have spent at least one month working at a Service Center under the supervision of an individual who has successfully completed Jiffy Lube's operations training course and (b) must have successfully completed certain prerequisite training courses prescribed by Jiffy Lube.

9.1.5   Every five years, the Franchisee or the Franchisee's officers who are responsible for the operation of the Franchised Center and the Franchisee's managers will be required to complete Jiffy Lube's operations training course for managers successfully in its then-current form unless Jiffy Lube, in its sole discretion, waives this requirement.

9.1.6   Notwithstanding any provision of this section 9, the Franchisee may conduct an operations training course for managers of the Franchised Center other than the initial managers of the Franchised Center, *provided* that Jiffy Lube has approved, in writing, the content and administration of the Franchisee's operations training course for managers. Jiffy Lube may review the Franchisee's operations training course periodically (a) to ensure that it is at least as comprehensive as the operations training course then being offered by Jiffy Lube, (b) to ensure that its content does not deviate from the requirements of the Manual, and (c) to verify that managers are being trained in a timely manner. Jiffy Lube will notify the Franchisee of any deficiencies in its training course for managers. If the Franchisee fails to take action to cure such deficiencies within a reasonable time, Jiffy Lube may revoke its approval of the Franchisee's operations training course and may require Franchisee's managers to attend Jiffy



Lube's operations training course until such time as the deficiencies have been corrected.

9.2     *Training for initial employees of the Franchised Center.*

If the Franchisee does not operate any Service Center other than the Franchised Center, and if the Franchised Center was not in operation as a Service Center before the date of this Agreement, then Jiffy Lube will provide operations training, and training in the use of the point of sale computer system described in section 10 of this Agreement, for the initial employees of the Franchised Center at the Franchised Center. Such training will be scheduled by Jiffy Lube in coördination with the Franchisee to occur in conjunction with the opening of the Franchised Center. Jiffy Lube will pay for the salary and travel expenses incurred by its trainer; the Franchisee will pay any other expenses associated with this training. The Franchisee or the Franchisee's officers who are responsible for the operation of the Franchised Center will be present during this initial training period.

9.3     *Other training.*

The Franchisee will ensure that its employees satisfy all training requirements specified in the Manual from time to time, and that they maintain consistently high standards of skill, efficiency and quality of workmanship.

10.     **POINT OF SALE COMPUTER SYSTEM**

10.1    *Initial POS hardware.*

No later than the later of (a) the date on which the Franchised Center opens for business, or (b) 60 days from the date of this Agreement, Jiffy Lube will give the Franchisee computer hardware for a single-station point of sale computer ("POS") unit for the Franchised Center (*i.e.*, a monitor (either color or monochrome, at Jiffy Lube's discretion), a central processing unit with characteristics sufficient to run the then-current version of the software required by Jiffy Lube, a modem and a cash drawer). The Franchisee will own this POS hardware. The foregoing notwithstanding, and without limiting the Franchisee's obligations under section 10.4 of this Agreement, Jiffy Lube is not required to provide POS hardware or replacement POS hardware to the Franchisee if the Franchisee is acquiring the Franchised Center from another Jiffy Lube franchisee.



10.2  *POS Software.*

10.2.1 Delivery.

At the same time as Jiffy Lube gives the Franchisee POS hardware, as described in section 10.1 of this Agreement, Jiffy Lube will provide to the Franchisee "POS Software." From time to time while this Agreement is in effect, Jiffy Lube may also provide new, revised or enhanced versions of the POS Software.

10.2.2 License.

The POS Software provided by Jiffy Lube is part of the System, and accordingly is covered by the non-exclusive license of the System granted to the Franchisee in section 3.1 of this Agreement. The Franchisee will acquire no ownership in the POS Software. If the POS Software is shared between multiple computer workstations on a communications network (not including "bay terminals" at the Franchised Center), each computer workstation must have its own separate POS Software. When this Agreement expires or is terminated, the Franchisee will return to Jiffy Lube or destroy all copies of the POS Software provided by Jiffy Lube (including copies in memory or data storage apparatus under the Franchisee's control) together with any manuals, disks or other media containing or describing the POS Software; the Franchisee will then warrant in writing to Jiffy Lube within 30 days of termination of this Agreement that the POS Software, related materials and all copies thereof have been returned to Jiffy Lube or destroyed.

10.2.3 Restrictions on copying.

The Franchisee may copy the POS Software, in whole or in part, only for backup and archive purposes. No more than one copy that can be executed or "run" may be in existence at any one time. Each copy will include, in readable format, any and all confidential, proprietary and copyright notices or markings contained on the original provided by Jiffy Lube.

10.2.4 Communication of restrictions.



The Franchisee agrees to communicate the restrictions that apply to use and copying the POS Software to the Franchisee's employees and to other agents of the Franchisee who use the POS Software.

10.2.5 Prohibition of unauthorized use.

The Franchisee will not knowingly use, or permit anyone else to use any portion of the POS Software for the purpose of deriving its source code. The Franchisee agrees to use all reasonable efforts to ensure that the Franchisee's employees and other agents of the Franchisee who use the POS Software abide by the terms and conditions of this Agreement insofar as it relates to the POS Software. If the Franchisee becomes aware that the POS Software is being used in a manner not authorized by this Agreement, the Franchisee will immediately use all reasonable efforts to cause such unauthorized use of the POS Software immediately to cease. The Franchisee will notify Jiffy Lube of any unauthorized use as soon as practical after its discovery.

10.2.6 Copyright.

The POS Software is protected by copyright and/or similar laws against unfair competition. Depending upon the POS Software provided, the copyright may be owned by Jiffy Lube or by an affiliate of Jiffy Lube or an unrelated entity. The Franchisee may be held responsible by the copyright owner for use of the POS Software in any manner not authorized by this Agreement.

10.2.7 Limited Warranty.

Jiffy Lube warrants that for a period of 90 days from date of delivery of the POS Software to the Franchisee, the POS Software will conform in all material ways to the performance defined in documentation relating to the POS Software (*e.g.*, manuals, guides, exclusion documents and computer-aided instructions). Jiffy Lube does not warrant that the operation of the POS Software will be uninterrupted or error-free. The Franchisee's sole and exclusive remedy for any failure of the POS Software to conform in all material ways to the performance defined in the pertinent documentation is to return the POS Software to Jiffy Lube and notify Jiffy Lube in writing of such nonconformity within 90 days of the POS Software's delivery to the Franchisee. Jiffy Lube's sole obligation will be to provide the Franchisee with replacement POS Software that



does conform to the express warranty stated above within a reasonable time after Jiffy Lube receives the notice of nonconformity.

10.2.8 Disclaimer of other warranties.

THE EXPRESS LIMITED WARRANTY SET FORTH IN SECTION 10.2.7 OF THIS AGREEMENT IS IN LIEU OF ALL OTHER EXPRESS WARRANTIES. THE IMPLIED WARRANTY OF MERCHANTABILITY IS LIMITED TO THE DURATION OF THE EXPRESS LIMITED WARRANTY. JIFFY LUBE DISCLAIMS ALL OTHER EXPRESS AND IMPLIED WARRANTIES WITH REGARD TO THE POS SOFTWARE, INCLUDING ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AND, FOLLOWING EXPIRATION OF THE EXPRESS LIMITED WARRANTY, THE IMPLIED WARRANTY OF MERCHANTABILITY OR ANY WARRANTY OF CONFORMITY TO MODELS, SAMPLES OR PROTOTYPES. JIFFY LUBE ALSO DISCLAIMS ANY AND ALL WARRANTIES OF OR REPRESENTATIONS CONCERNING THE POS SOFTWARE MADE BY PERSONS OTHER THAN JIFFY LUBE OR ITS AUTHORIZED REPRESENTATIVES.

10.2.9 Possible warranty rights under state law.

Some states do not allow limitations on how long an implied warranty lasts; if this is the case in the state in which the Franchised Center is located, the limitation in section 10.2.8 of this Agreement will not apply to the Franchisee.

10.2.10 Indemnification.

At Jiffy Lube's expense, Jiffy Lube will defend the Franchisee from claims that the POS Software infringes upon any patent, trade secret, or copyright, *provided* that Franchisee promptly notifies Jiffy Lube in writing of the alleged infringement, allows Jiffy Lube to defend the claim with attorneys of Jiffy Lube's choice, and cooperates with Jiffy Lube in the course of its defense of such claim. Because Jiffy Lube is willing to undertake the Franchisee's defense of these claims, as set forth above, Jiffy Lube will not be responsible for the Franchisee's litigation fees or expenses, or costs associated with voluntary settlements by the Franchisee unless Jiffy Lube has agreed in writing to pay such fees, expenses or costs. To settle or avoid a claim or possible claim of infringement, Jiffy Lube may, at its option and at no cost to the Franchisee, obtain a license from



Page 21

the owner of software upon which the POS Software is or may be claimed to infringe, or modify the POS Software, or substitute different POS Software. Jiffy Lube is not liable for any infringement due to (a) the POS Software being modified to specifications provided by the Franchisee, or (b) the POS Software being used in combination with equipment, software, or supplies not provided or specified by Jiffy Lube. Jiffy Lube makes no other express or implied warranty of non-infringement and, except as provided in this section 10.2.10, accepts no other liability in connection with infringement by the POS Software upon any patent, trade secret, or copyright.

10.2.11 Disclaimer of consequential damages.

**IN NO EVENT WILL JIFFY LUBE BE LIABLE TO THE FRANCHISEE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN ANY WAY ARISING OUT OF OR RELATING TO THE POS SOFTWARE. IN ADDITION, JIFFY LUBE'S LIABILITY TO THE FRANCHISEE FOR DIRECT DAMAGES ARISING OUT OF OR RELATING TO THE POS SOFTWARE IS LIMITED TO REPLACEMENT OF THE POS SOFTWARE.**

10.2.12 Possible right to damages under state law.

Some states do not allow the exclusion or limitation of incidental or consequential damages; if this is the case in the state in which the Franchised Center is located, the limitation in section 10.2.11 of this Agreement will not apply to the Franchisee.

10.2.13 Technical support.

The Franchisee and its employees may contact Jiffy Lube's POS Software technical support service ("Software Support Service") by telephone, electronic, fax or written communication from 7:00 a.m. to 8:00 p.m., central time prevailing in Houston, Texas, Mondays through Fridays, excluding holidays. Jiffy Lube will provide an "on call" service technician to attempt to answer questions relating to the POS Software on a limited basis in addition to the hours listed above. The Software Support Service will (a) attempt to answer the reasonable questions of the Franchisee and its employee pertaining to (i) the POS Software documentation ("User Manual") and (ii) the use and operation of the POS Software, (b) receive reports of known or suspected errors in the User Manual and the POS Software, and (c) provide Franchisees and their employees with



)                              )

corrections and/or "workarounds" for reported errors. The Software Support Service will not be required to provide support to any of the Franchisee's employees who have not attended a training class provided or approved by Jiffy Lube.

10.2.14 POS Software maintenance.

    (a)    *Corrections.* Jiffy Lube will give the Franchisee one copy of any corrections to the POS Software or the User Manual.

    (b)    *Technical Notes.* Whenever Jiffy Lube or the author of the POS Software publishes a technical notice pertaining to the POS Software or the User Manual, Jiffy Lube will give the Franchisee one copy of such technical notice.

10.2.15 Service limitations.

    (a)    Unless otherwise provided in this Agreement, the Software Support Service is remote services only.

    (b)    The Software Support Service does not include failure of software due to equipment or software not meeting Jiffy Lube's specifications, catastrophe, operator error, fault or negligence on the part of the Franchisee or its employees, or other, similar damages.

    (c)    Jiffy Lube may withdraw individual items from coverage under this Agreement upon 120 days' prior written notice, if such items are no longer generally in use by Jiffy Lube or its franchisees.

    (d)    The Franchisee may be required to provide additional training to its employees if excessive service calls related to operator error occur.

    (e)    Jiffy Lube may withhold support services if any amounts owed to Jiffy Lube by the Franchisee are more than 60 days past due.



10.2.16 Media distribution.

> Unless otherwise provided in this Agreement, Jiffy Lube will distribute POS Software media by regular mail, United Parcel Service (or some other private courier) or electronically *via* modem, at Jiffy Lube's option.

10.2.17 No unauthorized use or alteration of the POS Software.

> Jiffy Lube's obligation to provide Software Support Service does not extend to any modification or alteration of the POS Software (other than by Jiffy Lube's authorized personnel) or any unauthorized use of the POS Software. The Franchisee shall not modify, or permit its employees to modify, the POS Software. The Franchisee shall not use, or permit its employees to use, the POS Software in any way except in connection with operation of the Franchised Center.

10.2.18 No implied assistance or documentation.

Except as provided in this Agreement, Jiffy Lube has no obligation to provide any enhancements, upgrades, updates, new releases or assistance with regard to the POS Software.

10.3    *Costs associated with the POS system.*

10.3.1 Franchisee will pay all costs associated with installation of the POS System at the Franchised Center, including any extraordinary costs resulting from special installation needs (such as construction, remodeling, rewiring, additional wiring, or telephone line installation), and for all costs of hardware in addition to that which is provided by Jiffy Lube pursuant to section 10.1 of this Agreement.

10.3.2 Jiffy Lube will pay all telecommunication charges associated with the Franchisee's daily transmission of data to, or Franchisee's receipt of any data required for operation of the POS System updates from, Jiffy Lube.

10.3.3 Except as provided in section 10.3.2 of this Agreement, Franchisee will pay all costs of operation of the POS system other than telecommunications charges to or from Jiffy Lube, including (a) the cost of maintaining a separate telephone line, (b) labor costs, (c) all costs of hardware maintenance, repair, upgrades and replacement, and (d)



Page 24

charges for POS Software support services other than those provided under this Agreement which, if provided by Jiffy Lube or an affiliate of Jiffy Lube, will be invoiced to the Franchisee at the servicing entity's "per-call" rates according to terms and conditions in effect when the service is performed, together with room, board and travel charges incurred by any service technician.

10.4   *Operation of the POS system.*

The Franchisee will operate the POS system according to the standards and procedures prescribed by Jiffy Lube from time to time. The Franchisee will, among other things, transmit individual work order/invoice information daily to Jiffy Lube, including specified customer data (such as customer names and addresses including postal zip codes). Except as otherwise provided in section 11.6 of this Agreement, Jiffy Lube may not sell, disclose, or use data transmitted to it by the Franchisee for the benefit of any other person or entity without the Franchisee's consent.

10.5   *Changes in the POS system.*

From time to time, Jiffy Lube may find it desirable to modify or replace the POS Software it has provided to the Franchise or to change the specifications for, and require the replacement of, the POS hardware used in conjunction with the POS Software. Jiffy Lube will solicit comments from franchisees before making any substantial modification in the POS system. Jiffy Lube may satisfy this obligation by soliciting comments from (a) a committee or group of franchisees formed specifically to monitor POS matters (which may also include representatives of Jiffy Lube); or (b) from a representative sample of Jiffy Lube franchisees.

10.6   *Restriction on provision of unique POS characteristics to others.*

Jiffy Lube may develop proprietary POS Software for the System, or may license POS Software for use by the System from others. Jiffy Lube may not license, sublicense, furnish, or provide any enhancements to the POS system developed specifically for Jiffy Lube to any person or entity other than a Jiffy Lube franchisee or a Service Center operated by Jiffy Lube or an affiliate of Jiffy Lube.

## 11.   ACCOUNTING PROCEDURES

11.1   The Franchisee will maintain and preserve proper and complete books, records and accounts for at least seven years from the close of the fiscal year to which the books, records and accounts are related.



⟩                                                                    ⟩

11.2    Within 120 days after the end of the Franchisee's fiscal year, the Franchisee will provide Jiffy Lube with a statement of the Franchisee's income or loss (a "Profit and Loss Statement"), a statement of the Franchisee's financial position (sometimes called a "balance sheet") and a cash flow statement, both for the Franchised Center and for all of the Franchisee's Jiffy Lube-related business, reviewed by an independent certified public accountant. Within 30 days after the end of any calendar quarter, the Franchisee will provide Jiffy Lube with a Profit and Loss Statement, a cash flow statement and a balance sheet with regard to the calendar quarter just ended. In connection with occasional audits of Franchisee's business, Franchisee will furnish Jiffy Lube with a copy of all federal, state and local tax returns filed by Franchisee for the period being audited with respect to the Franchised Center. Jiffy Lube will have the right from time to time to request such additional financial, statistical or other information as Jiffy Lube may reasonably deem to be desirable.

11.3    If any examination or audit of the Franchisee's books and records discloses an understatement in any report of two percent or more of the Gross Sales of the Franchised Center, then in addition to paying the royalty owed on the theretofore unreported Gross Sales, with service charge specified in section 6.3 of this Agreement, the Franchisee will reimburse Jiffy Lube for its costs of having Franchisee's books examined or audited. The provisions of this section 11.4 are in addition to any other rights or remedies Jiffy Lube may have, including termination of this Agreement as provided in section 17 of this Agreement.

11.4    All of the information furnished by the Franchisee to Jiffy Lube will be correct in all material respects. All of the financial information furnished by the Franchisee to Jiffy Lube will be prepared and reported in a manner consistent with generally accepted accounting principles.

11.5    Jiffy Lube may use any financial statements, sales reports, or other financial or statistical information pertaining to the Franchised Center provided by the Franchisee in connection with Jiffy Lube's efforts to attract additional franchisees, to obtain financing or raise capital, *provided* that Jiffy Lube may not use such information in any manner by which such information is or could be traceable to, or identify, the Franchisee or the Franchised Center (except with respect to Jiffy Lube's efforts to sell the Franchised Center if it is acquired from the Franchisee). In addition, Jiffy Lube may disclose any such information that is required to be disclosed by any federal or state requirements, court orders, etc. Except as specifically provided in this section 11.6, Jiffy Lube will treat such information as confidential and will not disclose or sell such information or use it for the benefit of any other person or entity.

11.6    If the Franchisee fails to provide any required information or does not provide such information in the required format, Jiffy Lube will have the right, but not the

obligation, to obtain such information and the Franchisee will be responsible for any reasonable costs and expenses incurred in connection with gathering or reporting such information.

## 12.    OPERATION OF THE FRANCHISED CENTER

12.1    *Supervision by a trained manager.*

The Franchised Center at all times will be under the personal supervision of an individual who has completed Jiffy Lube's operations training course (or an alternate course approved by Jiffy Lube) successfully.  As used in this Agreement, "personal supervision" means that the individual (a) will be present at, or readily available to, the Franchised Center at opening, closing and peak business hours, (b) will inspect the Franchised Center regularly to insure the highest standards of cleanliness and general appearance, and (c) will assist in training employees.

12.2    *The Manual and the System Manuals.*

12.2.1  The Manual describes the System and its standard operating procedures. System Manuals which may be issued by Jiffy Lube from time to time describe particular phases of the System.  The Manual and all System Manuals are and will remain the exclusive property of Jiffy Lube; one copy of the Manual and each System Manual will be loaned to the Franchisee for the term of this Agreement. The Franchisee agrees to operate the Franchised Center in strict conformance with the Manual and any System Manuals.

12.2.2  The Franchisee understands and agrees that the System may from time to time be modified, and that such modifications to the System may require modifications in the Manual or the System Manuals or issuance of new System Manuals.  The Franchisee agrees that in the event of any such modifications to the System and the Manual or the System Manuals, it will operate the Franchised Center in strict conformance with the Manual and the System Manuals as so modified.  The Franchisee will insure that the copy of the Manual and any System Manuals loaned to the Franchisee are kept current; in the event of any dispute as to the contents of any such Manual, the contents of the master copy of such Manual maintained by Jiffy Lube at its principal place of business will be definitive.

12.2.3  The Franchisee will treat the Manual and any System Manuals, and the information contained in such Manuals, as confidential.  The Franchisee will use all reasonable efforts to maintain such information as confidential.



The Franchisee will not copy, duplicate, record or otherwise reproduce the Manual or any other System manuals, in whole or in part, and will not otherwise make the same available to any person other than its employees, and then only to the extent reasonably necessary.

12.3   *Approved products and supplies.*

12.3.1 From time to time, Jiffy Lube may prescribe certain minimum quality and/or warranty specifications for equipment, products and supplies used by the Franchisee in connection with building and operating the Franchised Center. To the extent that Jiffy Lube elects to do, these specifications will be listed in the Manual.

12.3.2 From time to time, Jiffy Lube may compile lists of products that meet Jiffy Lube's specifications, and may modify existing lists. If the Franchisee desires to use a product that is omitted from a list of similar products, the Franchisee will notify Jiffy Lube in writing before using such product. At Jiffy Lube's request, the Franchisee will provide a sample of the product and any relevant technical data to Jiffy Lube. Jiffy Lube will test the product at Franchisee's expense to determine whether the product meets Jiffy Lube's standards. If Jiffy Lube determines that the product does not meet its standards, the Franchisee will not use such product in the Franchised Center.

12.3.3 Jiffy Lube does not provide any warranty or guarantee to the Franchisee concerning products approved by Jiffy Lube but manufactured or sold by others.

12.3.4 The Franchisee will promptly and without offset or deduction pay any money owed to Jiffy Lube, any subsidiary of Jiffy Lube (including, for purposes of this Agreement, Heritage Merchandising Co., Inc., Jiffy Lube International of Maryland, Inc., and Jiffy Lube Insured Income Partners, L.P.) or any Coöperative (as that term is defined in section 13.1.1 of this Agreement) when such money is due.

12.4   *Maintenance of the Franchised Center.*

12.4.1 At its own expense, the Franchisee will maintain and periodically paint and renovate the interior and exterior of the Franchised Center in such manner as Jiffy Lube may reasonably prescribe from time to time so as to maintain standards of appearance consistent with the quality image of the System.



12.4.2 From time to time while this Agreement is in effect, Jiffy Lube may change the design specifications for signs, emblems, logos, lettering and pictorial materials displayed on or at the Franchised Center. Upon receipt of notice of such changes, the Franchisee will promptly alter the signs at the Franchised Center to conform to the revised specifications. Such revision will be at Franchisee's expense if revision occurs no more often than once in any three-year period.

12.4.3 From time to time while this Agreement is in effect, Jiffy Lube may require the Franchised Center to be remodeled at the Franchisee's expense once every ten years, *provided* that the Franchisee will not be required to remodel the Franchised Center if the time when the remodeling would be required is within one year of the expiration of the term of this Agreement, but *provided* further that such remodeling may be required as a condition of renewal of this Agreement.

12.5   *Retail pricing.*

The Franchisee may determine the retail prices for products and services offered at the Franchised Center. Jiffy Lube or other Jiffy Lube franchisees may advertise or recommend specified retail price; such recommendations are suggestions only, and do not bind the Franchisee to adopt any particular prices or pricing strategy.

12.6   *Hours of operation.*

The Franchised Center will be open for business during normal business hours and for the minimum hours and days specified in the Manual.

12.7   *Prohibited activities.*

In order to preserve consistency and uniformity within the System and goodwill associated with Service Centers and the Proprietary Marks, the Franchisee agrees not to engage in any business at the Franchised Center unless Jiffy Lube has expressly approved such business in the Manual or otherwise in writing. Prohibited activities include major engine overhauls, brake adjustment or repair, muffler installation, automobile painting, sale of automobile parts, and any sale of items that are not related to any service or business authorized by Jiffy Lube. The operation of a car wash is expressly permitted. Permission to offer any service or engage in any business at the Franchised Center other than those services and businesses expressly permitted in the Manual must be specifically obtained from Jiffy Lube in writing; Jiffy Lube may grant or withhold its permission for such businesses or services at its discretion.

12.8  *Inspections by Jiffy Lube.*

12.8.1  Jiffy Lube's field representatives may make announced or unannounced inspections of the Franchised Center to insure compliance with all requirements of this Agreement. At the conclusion of his inspection, the field representative may prepare a written report. If such a report is prepared, Jiffy Lube's field representative may give the Franchisee's manager a copy and will send or deliver a copy to the Franchisee's principal place of business. The Franchisee may, but is not required to, acknowledge or contest Jiffy Lube's field representative's conclusions and observations; neither an acknowledgment by a manager who is not an officer of the Franchisee nor the Franchisee's failure to contest the report will constitute a waiver of Franchisee's ability to contest any part of the report at some later time.

12.8.2  At reasonable times during normal business hours, Jiffy Lube's field representatives or auditors will be allowed to inspect books and records pertaining to the Franchised Center or any part of the Franchisee's Jiffy Lube business, including books and financial accounts maintained at the Franchisee's principal place of business or elsewhere which may be necessary in order to confirm the Franchisee's compliance with any provision of this Agreement (including advertising records in the possession of the Franchisee's advertising agency which may be necessary to confirm the Franchisee's compliance with the requirements of section 13.1 of this Agreement). Jiffy Lube may require that an officer of the Franchisee accompany Jiffy Lube's field representative and the manager of the Franchised Center during an announced inspection of the Franchised Center.   Likewise, Jiffy Lube may require that a person familiar with the Franchisee's accounting practices or a representative of the Franchisee's advertising agency be present at any announced visit to Franchisee's principal place of business.   Jiffy Lube will use reasonable effort to give at least two weeks' notice of any announced inspection or visit.

## 13.   ADVERTISING

13.1  *Minimum expenditure on advertising.*

The Franchisee will spend or contribute five percent of the Gross Sales of the Franchised Center for advertising and promotion of the Franchised Center, as follows:



13.1.1 If a local or regional advertising coöperative association (a "Coöperative") is formed for any locality, region or trading area in which the Franchised Center is located, the Franchisee will make monthly contributions to the Coöperative equal to five percent of the Gross Sales of the Franchised Center for the preceding month, *provided* that if Jiffy Lube has consented in writing to the Coöperative's assessment of monthly contributions at a lower rate, then the Franchisee will contribute to the Coöperative at the rate to which Jiffy Lube has consented, and will spend the balance of five percent of the Gross Sales of the Franchised Center on local advertising.

13.1.2 If no Coöperative is formed for any locality, region or trading area in which the Franchised Center is located, or if the Franchisee is excused from the requirement to become a member of such a Coöperative pursuant to section 13.2.2 of this Agreement, then the Franchisee will spend five percent of the Gross Sales of the Franchised Center on local advertising. The Franchisee will be deemed to have satisfied this requirement if the Franchisee's aggregate calendar-year expenditures on local advertising equal or exceed five percent of the aggregate Gross Sales of the Franchised Center during that calendar year.

13.2   *Formation of a Coöperative*

13.2.1 A Coöperative will be formed in a geographic area determined by Jiffy Lube to be appropriate either (a) at the request of one-half or more of the then-existing franchisees located in that area, or (b) at such other time as Jiffy Lube deems appropriate. If a Coöperative exists in the area in which the Franchised Center is located, then the Franchisee will become a member of such Coöperative as soon as is practical.

13.2.2 The Franchisee may request that Jiffy Lube excuse it from the requirement of membership in a Coöperative. Jiffy Lube's decision with regard to any requested excuse from membership in a Coöperative will be final. Pending resolution of a request to be excused from required membership in a Coöperative, the Franchisee will continue to make the required contributions to the Coöperative.

13.2.3 Any Coöperative will be formed and operated in a form and manner of which Jiffy Lube approves. Any advertising and promotional plans and materials the Coöperative wishes to use must receive Jiffy Lube's prior written approval. The Coöperative will be responsible to its members to expend the funds entrusted to it in an equitable manner; however, benefits may not be directly proportional to contributions. Any contribution or



Page 31

payment required to be made to a Coöperative must be made on or before the 15th day of each month based on the Gross Sales of the Franchised Center for the preceding month. The Coöperative will use the funds contributed to it by the members of the Coöperative to provide advertising in the area the Coöperative was formed to serve, and to develop standardized promotional material for advertising programs in that area for the benefit of member franchisees. Jiffy Lube's right to approve a Coöperative's operation includes a right to monitor and/or audit advertising expenditures by the Coöperative.

13.3   *Approval of advertising by Jiffy Lube.*

All of the Franchisee's advertising in any medium will conform to the standards and requirements of the Manual. The Franchisee will submit to Jiffy Lube and obtain Jiffy Lube's prior approval of all advertising copy and promotional plans and materials that the Franchisee wishes to use, provided that Jiffy Lube need not approve materials it provides to the Franchisee or that have been approved previously by Jiffy Lube. Jiffy Lube may not refuse to approve such materials arbitrarily. If Jiffy Lube's written disapproval of advertising materials submitted by the Franchisee is not received by the Franchisee within 15 days from the date Jiffy Lube receives such materials, Jiffy Lube will be deemed to have given the required approval.

13.4   *Advertising materials provided by Jiffy Lube.*

During the term of this Agreement, Jiffy Lube will provide print, radio and/or television marketing materials at no charge to the Franchisee. Such marketing materials will include (a) materials which refer to "Jiffy Lube" and to products sold by Jiffy Lube's affiliate, Pennzoil Products Company or other suppliers ("Supplier Materials") and (b) materials which refer to "Jiffy Lube" and do not refer to any specific supplier to Service Centers ("Generic Materials"). There is no requirement of numerical or other equality between Supplier Materials and Generic Materials.

## 14.   TRANSFERABILITY OF INTERESTS

14.1   *Transfer by Jiffy Lube.*

Jiffy Lube may transfer or assign all or any part of its rights or obligations under this Agreement to any person or entity.



14.2   *Transfer by the Franchisee.*

14.2.1 The Franchisee acknowledges that its rights and duties under this Agreement are personal to the Franchisee, and that Jiffy Lube has granted this franchise in reliance on the Franchisee's business skill and financial capacity.  The Franchisee may not assign any of its rights or delegate any of its duties under this Agreement, or pledge this Agreement to secure a loan or other obligation, without the prior written consent of Jiffy Lube.  The Franchisee may not sell or otherwise dispose of any interest in the Franchised Center without Jiffy Lube's prior written consent.  Jiffy Lube has no obligation to consent to the assignment of the Franchisee's rights or delegation of its duties under this Agreement, or the sale or other disposal of the Franchised Center to a corporation the stock of which is traded on any public stock exchange [including the National Association of Securities Dealers Automated Quotation system ("NASDAQ")].

14.2.2 If the Franchisee is a closely-held corporation or a partnership, no shareholder or general partner may sell or otherwise dispose of its interest in the Franchisee, or pledge its interest in the Franchisee to secure a loan or other obligation, without Jiffy Lube's prior written consent, except that a shareholder or partner may sell its, his or her stock or partnership interest to another stockholder or general partner of the Franchisee without Jiffy Lube's consent if such sale or disposition, alone or together with other sales, does not result in a change of control of the Franchisee.  If the Franchisee is a closely-held corporation or a partnership, the Franchisee may not cause new stock or partnership interests to be issued to any person, except to another stockholder or general partner of the Franchisee, without Jiffy Lube's prior written consent.  Jiffy Lube is under no obligation to consent to the issuance of new stock or partnership interests of the Franchisee to a corporation the stock of which is traded on any public stock exchange, including NASDAQ.

14.2.3 Neither the Franchisee or any stockholder or general partner of the Franchisee may register the Franchisee's stock for sale pursuant to the Securities Act of 1933.  Neither the Franchisee nor any stockholder or general partner may cause the stock of the Franchisee to be traded on any public stock exchange, including NASDAQ.



14.2.4 In the event of any permitted assignment of this Agreement, Jiffy Lube may, in its sole discretion, require any or all of the following as conditions of its approval:

(a) The transferor may be required to satisfy all accrued monetary obligations of the transferor to Jiffy Lube and its affiliates in connection with the Franchised Center (including obligations guaranteed by the transferor);

(b) The transferor may be required to remain liable for performance of the Franchisee's obligations under this or any substitute Franchise Agreement or the transferor may be required to guarantee certain obligations of the transferee;

(c) The transferor may be required to execute, with Jiffy Lube, a mutual general release, in a form satisfactory to Jiffy Lube, of any and all claims against each other and their respective affiliates, officers, directors, shareholders, agents and employees, except:

(i) claims of which either Jiffy Lube or the Franchisee has given written notice to the other party before the date of the transfer [*provided* that any such claim shall be lost and forever waived in the event such claim is not resolved or suit instituted within the earlier of (1) one year from the date of the transfer, or (2) the expiration of the otherwise applicable statutory or contractual limitations period];

(ii) claims by Jiffy Lube for royalties, reminder mail charges, fleet account debits, computer hardware support charges and other similarly periodic, liquidated or readily calculable indebtedness arising under this or any other agreement;

(iii) claims by the Franchisee for fleet account credits and other periodic, liquidated or readily calculable indebtedness arising under this or any other agreement; and

(iv) claims by Jiffy Lube to enforce any obligations arising under section 18 or section 19.2 of this Agreement.



(d)     If the transfer is an assignment of the Franchisee's rights, and a delegation of the Franchisee's duties, under this Agreement, the transferee and its stockholders or general partners may be required to execute Jiffy Lube's then-current form of Franchise Agreement, for a term ending on the expiration date of this Agreement, and such other ancillary agreements (including a lease or sublease, option agreement or contingent assignment and assumption agreement) as Jiffy Lube may require for a Service Center then being newly franchised;

(e)     If the transfer is of a controlling interest in the Franchisee, the Franchisee and its new stockholders or general partners may be required to execute Jiffy Lube's then-current form of Franchise Agreement, for a term ending on the expiration date of this Agreement, and such other ancillary agreements (including a lease or sublease, option agreement or contingent assignment and assumption agreement) as Jiffy Lube may require for a Service Center then being newly franchised;

(f)     The transferee may be required to submit to Jiffy Lube a financial statement and other documentation reasonably required by Jiffy Lube, sufficient to demonstrate to Jiffy Lube's satisfaction that the transferee meets Jiffy Lube's managerial and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Center (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate the Franchised Center;

(g)     The transferee may be required to make payments accrued before the transfer but not yet due at the time of the transfer (e.g., royalties);

(h)     An individual transferee or officers of a corporate transferee who will be involved in the operation of the Franchised Center may be required to complete any training programs then in effect for franchisees; and



(i)     If the transfer is an assignment of the Franchisee's rights, and a delegation of the Franchisee's duties, under this Agreement, or if the transfer is of a controlling interest in the Franchisee, the transferee may be required to pay Jiffy Lube a transfer fee in an amount equal to ten percent of the then-current franchise fee for new Service Centers, plus all actual expenses incurred by Jiffy Lube in connection with the transfer.

14.2.5  Jiffy Lube may condition its consent to a pledge of this Agreement to secure a loan or other obligation as follows:

(a)     Jiffy Lube may require that the Franchisee provide Jiffy Lube with complete copies of any instruments evidencing such loan or obligation and any agreement granting or describing the security for such debt (the "Debt Agreements").

(b)     Jiffy Lube may require, among other things: (i) that a default under the Debt Agreements constitute a default under this Agreement and all other agreements between Jiffy Lube and the Franchisee; (ii) that the creditor give Jiffy Lube notice of any default by the borrower under the terms of any of the Debt Agreements, (iii) that such notice be contemporaneous with any notice to the borrower; (iv) that if the borrower does not cure the noticed default within the time provided for such cure (if any), then within a period of 30 days after the expiration of any cure period available to the Franchisee, Jiffy Lube may cure the borrower's default by paying to the lending institution all money due to it under the Debt Agreements, excluding any prepayment penalties; (v) that upon such cure by Jiffy Lube, the lending institution will assign to Jiffy Lube all of its rights under this Agreement, the lease of the premises at which the Franchised Center is located, and any other rights pertaining to Franchisee's Jiffy Lube business as the lending institution may hold; (vi) that if Jiffy Lube fails to cure this Agreement in the manner described above, the lending institution to which this Agreement is pledged or assigned as collateral will be bound to all of the terms of this Agreement and may not transfer this Agreement to any other person or entity without Jiffy Lube's consent; and (vii) that a default under this Agreement



)                                    )

or any other agreement between Jiffy Lube and the
Franchisee constitute a default under the Debt Agreements.

14.3    *Transfer to the Franchisee's corporation or partnership.*

If the Franchisee is an individual or group of individuals, and if a proposed transfer is
to a corporation or partnership formed by the Franchisee without distributing stock or
partnership interests to any person other than the Franchisee, Jiffy Lube's consent to the
proposed transfer may be conditioned on the following requirements in addition to
those specified in section 14.2.4 of this Agreement:

14.3.1  Each stock certificate of the transferee corporate franchisee or certificate of
        interest of the transferee partnership will be conspicuously marked with a
        statement to the effect that an ownership interest in the transferee is held
        subject to the terms of this Agreement, and that further transfer of such
        ownership interest is subject to the terms of this Agreement;

14.3.2  All shareholders or partners of the transferee franchisee may be required
        (a) jointly and severally to guarantee the transferee franchisee's
        performance of its obligations under this Agreement and (b) to agree to
        the terms of this Agreement that apply to shareholders or partners of
        franchisees; and

14.3.3  The transferee franchisee may be required to give Jiffy Lube copies of its
        articles of incorporation, certificate of partnership, by-laws, and all other
        governing documents, together with copies of relevant resolutions,
        including the resolution authorizing the transferee franchisee to accept the
        rights and assume the duties of the Franchisee under this Agreement.

14.4    *Transfer and issuance of securities.*

14.4.1  The Franchisee will not authorize a transfer of any of its stock or other
        securities, or enter such a transfer on its records, unless the transfer
        complies with the provisions of this section 14. All of the Franchisee's
        stock or other securities will be conspicuously marked with a statement
        similar to the following:

        The transfer of this security is subject to the terms and
        conditions of a Franchise Agreement between Jiffy Lube
        International, Inc., and *[the Franchisee's name]* dated
        _____. Reference is made to said Franchise



Page 37

Agreement and to the Articles of Incorporation and By-laws of this corporation.

14.4.2 Neither the Franchisee nor stockholders or partners of the Franchisee will make any public offerings of the securities of the Franchisee, whether or not such an offering would effect a change in control of Franchisee. For purposes of this Agreement, a "public offering" is an offer of securities of the Franchisee requiring registration under the Securities Act of 1933 or a similar statute.

14.5    *Jiffy Lube's right of first refusal.*

14.5.1  If the Franchisee wishes to accept a *bona fide* offer from a person other than Jiffy Lube (an "Offeror") to purchase the Franchised Center or an interest in the Franchised Center, the Franchisee will notify Jiffy Lube in writing of the precise terms of such offer and provide Jiffy Lube with copies of all documents containing such terms and Jiffy Lube will have 20 days after receipt of such written notice and such copies to send written notice to the Franchisee that Jiffy Lube or a party designated by Jiffy Lube will purchase the Franchised Center (or an interest in the Franchised Center) on the same terms and conditions offered by the third party or their cash equivalent, subject to Jiffy Lube's inspection of the Franchised Center and determination that it is reasonably free from contamination by hazardous wastes or substances.

14.5.2  If any stockholder or general partner of the Franchisee desires to accept a *bona fide* offer from an Offeror to purchase that stockholder's or general partner's interest in the Franchisee, that stockholder or general partner will notify Jiffy Lube in writing of the precise terms of such offer and Jiffy Lube will have 20 days after receipt of such written notice, to send written notice to that stockholder or general partner that Jiffy Lube or a party designated by Jiffy Lube intends to purchase that stockholder's or general partner's interest on the same terms and conditions offered by the third party or their cash equivalent, subject to Jiffy Lube's inspection of the Franchised Center and determination that it is reasonably free from contamination by hazardous wastes or substances.

14.5.3  If Jiffy Lube exercises its rights under sections 14.5.1 or 14.5.2 of this Agreement, but if the parties cannot agree on the cash equivalent of the Offeror's offer, then Jiffy Lube will designate an independent appraiser at Jiffy Lube's expense, and the appraiser's determination will be binding on both parties.



14.5.4 If Jiffy Lube exercises its rights under sections 14.5.1 or 14.5.2 of this Agreement, then closing on such purchase must occur within 60 days from the date of Jiffy Lube's written notice to the seller of Jiffy Lube's exercise of such rights.

14.5.5 If Jiffy Lube does not exercise its rights under sections 14.5.1 or 14.5.2 of this Agreement, then, subject to Jiffy Lube's rights to approve the proposed transfer, the seller may transfer the Franchised Center or interest in the Franchised Center or the Franchisee (as the case may be) to the Offeror on the exact terms contained in the Offeror's offer. Any material change in the terms of the Offeror's offer before closing will constitute a new offer subject to the same rights of first refusal by Jiffy Lube as in the case of an initial offer. Jiffy Lube's failure to exercise its rights under sections 14.5.1 or 14.5.2 of this Agreement will not constitute a waiver of any other provision of this Agreement, including all of the requirements of this section 14 with respect to Jiffy Lube's right to approve, and to impose conditions on, a proposed transfer.

14.6   *Transfer to a member of the immediate family.*

If a proposed transferee of the Franchised Center or an interest in the franchisee is a member of the immediate family (parent, spouse, son, daughter or sibling) of the proposed transferor, Jiffy Lube will not have any right of first refusal as provided in section 14.5 of this Agreement; however, Jiffy Lube retains all of the rights described in this section 14 with respect to Jiffy Lube's right to approve, and to impose conditions on, a proposed transfer.

14.7   *Transfer upon death or permanent incapacity.*

Upon (a) the death or permanent incapacity of an individual Franchisee or a stockholder or general partner of the Franchisee who, at the time of his or her death or incapacity, has the right to control the Franchisee or upon (b) the dissolution of a Franchisee that is a partnership or corporation, then the executor, administrator, personal representative or trustee of such person or entity will transfer his, her or its interest to a third party approved by Jiffy Lube within a reasonable time. Such transfers, including, without limitation, transfers by devise or inheritance, will be subject to the same conditions as apply to any other transfer except that in the event of an approved transfer to a member of the immediate family (parent, spouse, son, daughter or sibling) of an individual Franchisee or a stockholder or general partner of the Franchisee, then Jiffy Lube may not require a fee in connection with the transfer.



14.8   *Non-waiver of claims.*

Jiffy Lube's consent to any transfer in the manner prescribed by this section 14 will not constitute a waiver of any claims Jiffy Lube may have against the transferor. Jiffy Lube's consent to any transfer in the manner prescribed by this section 14 will not be deemed a waiver of Jiffy Lube's right to demand exact compliance with the terms of this Agreement by the transferee.

## 15.   INSURANCE

15.1   Before opening for business and throughout the term of this Agreement, the Franchisee will secure, maintain and pay for insurance as follows:

15.1.1 Casualty or property insurance, insuring the Franchised Center, including its building, equipment, supplies and inventory, against loss or damage by fire, windstorm and other risks usually insured against by owners of similar property in the area in which the Franchised Center is located (such as flood insurance if the Franchised Center is located in a flood plain and earthquake insurance if the Franchised Center is located in an area known to be susceptible to earthquakes). Such coverage may not be less than 80% of the replacement cost of the insured assets. Any damage to the Franchised center will be repaired, and the Franchised Center will be restored or rebuilt, within 120 days from the date of loss or damage.

15.1.2 Employer's liability insurance with a minimum limit of $500,000.00 and workers' compensation insurance as prescribed by the law of the state or jurisdiction in which the Franchised Center is located. (This insurance will be secured and maintained as soon as the Franchisee has employees, including any time during any training class held before the Franchised Center opens for business.)

15.1.3 Public liability insurance in an amount not less than $3,000,000.00 for combined single limit bodily injury and personal damage, insuring the Franchisee and Jiffy Lube against any liability that may accrue against them or any of them on account of (a) any occurrence in or about the Franchised Center during the term of this Agreement or (b) in consequence of the Franchisee's operation of the Franchised Center, when such occurrence results in actual or alleged personal injury, death or property damage.



15.1.4 Garagekeepers' liability insurance in an amount not less than $60,000.00 per occurrence in conjunction with the care, custody and control of vehicles at the Franchised Center.

15.1.5 Business interruption insurance which includes rent obligations covering a period of not less than six months.

15.2    All insurance policies required by this Agreement will be issued by a company with a Best's Key Rating Guide® rating of "A" or better.

15.3    Before the Franchised Center opens for business and annually thereafter at such times as the annual financial statements are provided as required by section 11.2 of this Agreement, the Franchisee will give Jiffy Lube copies of a certificate of insurance evidencing the coverage described in section 15.1 of this Agreement and providing that such insurance will not be canceled, amended or modified without 30 days' prior written notice to Jiffy Lube. At Jiffy Lube's request, the Franchisee shall provide Jiffy Lube with a copy of each insurance policy required by this Agreement and/or evidence of payment of premiums.

15.4    If the Franchisee fails to procure or continue any of the insurance described in this section 15, then Jiffy Lube is authorized, but not obligated, to procure the same and the Franchisee will promptly reimburse Jiffy Lube for the cost of such insurance.

15.5    The Franchisee will cause Jiffy Lube to be named as an "additional insured" on all insurance policies required by this Agreement.

## 16.    HOLD HARMLESS

Except as provided in section 5.1.4 of this Agreement with regard to claims involving the Proprietary Marks and section 10.2.10 of this Agreement with regard to the POS Software, the Franchisee will hold harmless and indemnify Jiffy Lube, Jiffy Lube's subsidiaries and affiliates, and their respective officers, directors, shareholders, agents and employees, from and against any and all losses, expenses, judgments, claims, reasonable attorneys' fees, and damages arising out of or in connection with any claim arising directly or indirectly from, as a result of, or in connection with the Franchisee's operation of the Franchised Center, regardless of whether Jiffy Lube contributed to, or is alleged to have contributed to the claim by its own active or passive negligence. The Franchisee will promptly notify Jiffy Lube of any claims or actions filed by or against the Franchisee in connection with the operation of the Franchised Center and, upon request, will furnish Jiffy Lube with copies of documents relating to such claims or actions.



## 17.   DEFAULT AND TERMINATION.

17.1   *The Franchisee's bankruptcy and related matters.*

Except to the extent prohibited by applicable law (such as the Bankruptcy Reform Act of 1978), the Franchisee will be deemed to be in default under this Agreement, and all rights granted in this Agreement will automatically terminate without notice to the Franchisee, if the Franchisee (a) becomes insolvent, (b) makes a general assignment for the benefit of creditors, (c) suffers the filing of a voluntary or involuntary bankruptcy petition which is not dismissed within 60 days after filing, (d) is adjudicated a bankrupt, (e) suffers temporary or permanent court-appointed receivership of substantially all of its property, (f) suffers or permits execution levied against the Franchisee's business or property, (g) suffers or permits suit to be filed to foreclose any lien or mortgage against the premises or equipment of the Franchised Center and such suit is not dismissed within 30 days, or (h) suffers or permits the real property at which the Franchised Center is located, or personal property located at the Franchised Center, to be sold after levy thereupon by any sheriff, marshal, or constable, provided, however, that the Franchisee will not be deemed to be in default if such execution, levy or sale affects only personal property which can be removed from the Franchised Center without material disruption to the business conducted at the Franchised Center.

17.2   *Termination without opportunity to cure by the Franchisee.*

Upon the occurrence of any of the defaults described in this section 17.2, Jiffy Lube may terminate this Agreement and all rights granted under this Agreement without affording the Franchisee any opportunity to cure the default, and such termination will be effective immediately upon the Franchisee's receipt of notice of the default.

17.2.1   The Franchisee fails (a) to acquire a lease or fee interest in an approved site within the time provided by section 7 of this Agreement or (b) to open the Franchised Center within the time provided by section 8.3 of this Agreement.

17.2.2   The Franchisee fails to repair, restore or rebuild any material loss or damage to the Franchised Center within the time provided by section 15.1.3 of this Agreement.

17.2.3   The Franchisee discontinues operation of the Franchised Center, or loses the right to possession of the premises at which the Franchised Center is located or otherwise forfeits the right to do business where the Franchised Center is located.



17.2.4 The Franchisee (or one of the Franchisee's officers, directors, stockholders or general partners) is convicted of a felony or a crime involving moral turpitude, consumer fraud, or any other crime or offense that in Jiffy Lube's sole opinion is reasonably likely to have an adverse effect on the System or the Proprietary Marks, or the goodwill associated with the System or the Proprietary Marks, unless, in the case of one of the Franchisee's officers or directors, the convicted officer's or director's employment and office with the Franchisee is terminated within 30 days of the date on which such conviction becomes final.

17.2.5 The construction, maintenance or operation of the Franchised Center results in a threat or danger to public health or safety.

17.2.6 The Franchisee transfers or attempts to transfer an interest in the Franchised Center without Jiffy Lube's prior written consent, contrary to the provisions of section 14 of this Agreement.

17.2.7 The stockholder or general partner of the Franchisee transfers or attempts to transfer an interest in the Franchisee without Jiffy Lube's prior written consent, contrary to the provisions of section 14 of this Agreement.

17.2.8 The Franchisee fails to comply with the in-term covenants set forth in section 19.1 of this Agreement.

17.2.9 The Franchisee discloses Confidential Information, contrary to the provisions of section 5.2 of this Agreement, provided that disclosures by former, non-officer employees of the Franchisee will not be grounds for termination of this Agreement.

17.2.10 The Franchisee repeatedly fails to make timely payments of any money owing to Jiffy Lube, any subsidiary of Jiffy Lube, or a Coöperative.

17.2.11 The Franchisee repeatedly deviates from the requirements of the Manual.

17.2.12 The Franchisee knowingly makes any material false statements in any reports or financial information submitted to Jiffy Lube.

17.3   *The Franchisee's opportunity to cure certain defaults.*

Except as provided in sections 17.1 and 17.2 of this Agreement, (a) the Franchisee will have 30 days after its receipt of a written notice of default from Jiffy Lube within which to cure any default under this Agreement, the Manual or any of the System Manuals, or

Page 43

(b) if a default is not a monetary default and is of a nature that it cannot reasonably be completely cured in 30 days, the Franchisee must begin and diligently pursue a cure within 30 days after its receipt of a written notice of default from Jiffy Lube, but may have a reasonable time within which to cure such default. If any default described in a notice of default given under this section 17.3 is not cured, or if a cure is not begun and diligently pursued, within the time provided by this section 17.3 (or such longer period as applicable law may require), then Jiffy Lube may terminate this Agreement without further notice to the Franchisee, effective immediately upon the expiration of the period provided by this section 17.3 (or such longer period as applicable law may require).

17.4    *Defaults under other agreements or arrangements.*

17.4.1  The Franchisee will promptly and without offset or deduction pay any money owed to Jiffy Lube, any subsidiary of Jiffy Lube or any Coöperative when such money is due; the Franchisee's failure to do so will constitute a default under this Agreement for which a notice of default may be given under section 17.3 of this Agreement.

17.4.2  Entities controlled by or under common control with the Franchisee will make all payments to Jiffy Lube and Jiffy Lube's affiliates when those payments are due, without offset or deduction; such entities' failure to do so will constitute a default under this Agreement for which a notice of default may be given under section 17.3 of this Agreement. For purposes of this Agreement, an entity is "controlled by" the Franchisee if the Franchisee owns a majority of the voting stock or partnership interest of the entity, or if the Franchisee has a contractual right to manage the entity; an entity is "under common control" with the Franchisee if some combination of the owners of a majority of the voting stock or partnership interest of the Franchisee also own a majority of the voting stock or partnership interest of the entity.

17.4.3  If the Franchisee is controlled by or under common control with one or more other franchisees of Jiffy Lube, then at Jiffy Lube's option the Franchisee shall cause each other such franchisee to execute the Agreement in the space provided in section 21 of this Agreement to signify its agreement that the Franchisee's failure to make all payments to Jiffy Lube and Jiffy Lube's affiliates when those payments are due, without offset or deduction, will constitute a default under each franchise agreement with each other such franchisee as if such franchisee had failed to make a payment to Jiffy Lube under each franchise agreement to which it is a party, with regard to which default Jiffy Lube may give notice of default in the manner provided by such other franchise agreement(s).



## 17.5 *Defaults by Jiffy Lube*.

In the event of a material default by Jiffy Lube of its obligations to the Franchisee under this Agreement (a) Jiffy Lube will have 30 days after its receipt of a written notice of default from the Franchisee within which to cure any default under this Agreement, or (b) if a default is of a nature that it cannot reasonably be completely cured in 30 days, Jiffy Lube must begin and diligently pursue a cure within 30 days after its receipt of a written notice of default from the Franchisee, but may have a reasonable time within which to cure such default. If any default described in a notice of default given under this section 17.5 is not cured, or if a cure is not begun and diligently pursued, within the time provided by this section 17.5, then the Franchisee may terminate this Agreement without further notice to Jiffy Lube, effective immediately upon the expiration of the period provided by this section 17.5.

## 18.   OBLIGATIONS UPON EXPIRATION OR TERMINATION

Upon (a) expiration or termination of this Agreement for any reason whatsoever, or (b) transfer of the Franchised Center:

18.1   If as a result of an expiration or termination of this Agreement, the Franchisee vacates the Franchised Center and Jiffy Lube obtains possession of the Franchised Center, then Jiffy Lube will either reimburse the Franchisee or credit the Franchisee's accounts with Jiffy Lube and its affiliates with an amount equal to one-half of the then-current price quoted by Heritage Merchandising Co., Inc., for any tools, equipment and non-inventory personal property owned by the Franchisee and remaining at the Franchised Center at the time of the expiration or termination of this Agreement plus the Franchisee's actual cost for any usable inventory owned by the Franchisee and remaining at the Franchised Center at the time of the expiration or termination of this Agreement.

18.2   The Franchisee will promptly surrender to Jiffy Lube or, if so directed by Jiffy Lube, destroy and immediately discontinue the use of, all service marks, trademarks, trade names, signs, structures, literature, forms, or promotional advertising materials, and any other article of personal property using the Proprietary Marks or the words "Jiffy Lube" or any name, service mark or trademark which may be confusingly similar to any of the Proprietary Marks.

18.3   If the Franchisee retains possession of the Franchised Center, then at its own expense, the Franchisee will make whatever changes in the building Jiffy Lube may reasonably require so as (a) to differentiate the business conducted at the Franchised



Page 45

Center after expiration or termination of this Agreement from the business conducted at a Service Center and (b) to differentiate the Franchised Center from Service Centers.

18.4    If the Franchisee retains possession of the Franchised Center, the Franchisee will offer to Jiffy Lube all inventory marked with any of the Proprietary Marks at the Franchisee's original purchase price less a ten percent restocking charge.    The Franchisee will dispose of any inventory bearing any of the Proprietary Marks that is not repurchased by Jiffy Lube in the manner prescribed by Jiffy Lube at the time.

18.5    Franchisee will discontinue any telephone listings, radio and newspaper advertising, and any other form of commitment which may in any way identify the Franchisee as a Jiffy Lube franchisee.

18.6    The Franchisee will return to Jiffy Lube the Manual, all System Manuals and all copies of Confidential Information acquired by Franchisee before the termination or expiration of this Agreement.

18.7    The Franchisee will not continue to use any Confidential Information, systems or procedures learned as a result of, or covered by, this Agreement.

18.8    The Franchisee will return or destroy all POS Software together with any manuals, disks or other media containing or describing the POS Software, as provided in section 10.2.2 of this Agreement.

18.9    If the Franchisee fails to comply with its obligations under this section 18 Jiffy Lube may enter the Franchised Center and remove copies of Confidential Information and materials marked with any of the Proprietary Marks, without liability to the Franchisee and without being deemed to have committed a trespass or any other tort.

18.10   The Franchisee and Jiffy Lube will make a prompt, final accounting upon expiration or termination of this Agreement or its transfer with Jiffy Lube's consent, and any sums owed by either party to the other will be paid immediately.

18.11   The provisions of this section 18 survive expiration or termination of this Agreement.

### 19.    COVENANTS NOT TO COMPETE

The Franchisee acknowledges that the methods of doing business and other elements of which the System is composed are distinctive and have been developed by Jiffy Lube at great effort, time and expense. While this Agreement is in effect, Franchisee will have regular and continuing access to Confidential Information and training regarding the

System. Franchisee has the obligation to promote and develop the Franchised Center. Franchisee accordingly agrees as follows:

19.1     *"In term" covenants.*

19.1.1 The Franchisee and each of the stockholders, officers and directors of the Franchisees who sign this Agreement in the space following section 21, covenant that during the term of this Agreement, neither it nor any of its stockholders, officers, directors or employees will divert or attempt to divert any business or customer of the Franchised Center to any competitor, by direct or indirect inducement, directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.

19.1.2 The Franchisee covenants that during the term of this Agreement, the Franchisee will not employ or seek to employ any person who is or within the preceding six months has been an employee of Jiffy Lube or of any franchisee of Jiffy Lube, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.

19.1.3 The Franchisee and each of the stockholders, officers and directors of the Franchisees who sign this Agreement in the space following section 21, covenant that during the term of this Agreement, neither the Franchisee nor any of its stockholders, officers or directors will own, maintain, engage in, have any interest in, be employed by, or perform any service for any business which is the same as or substantially similar to the business conducted by the Franchised Center and which is located within the state in which the Service Center is located or within ten (10) miles of any other Jiffy Lube Service Center in the United States, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any other person.

19.2     *"Post term" covenants.*

19.2.1 The Franchisee covenants that for one year after (a) expiration or termination of this Agreement (regardless of the cause of termination) or (b) transfer of the Franchised Center, the Franchisee will not employ or seek to employ any person who is or within the preceding six months has been an employee of Jiffy Lube or of any franchisee of Jiffy Lube, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.



19.2.2 The Franchisee and each of the stockholders, officers and directors of the Franchisees who sign this Agreement in the space following section 21, covenant that for a period of three years after the expiration or termination of this Agreement (regardless of the cause of termination) or transfer of this Agreement, neither the Franchisee nor any of its stockholders, officers or directors will own, maintain, engage in, have any interest in or perform any service for any business, which is the same as or substantially similar to the business conducted under this Agreement, and which is located: (a) within a ten-mile radius of the Franchised Center, or (b) within a ten-mile radius of any Service Center within the state in which the Franchised Center is located, or (c) within a ten-mile radius of any Service Center in the United States, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any other person.

19.2.3 The provisions of this section 19.2 survive expiration or termination of this Agreement.

19.3   *Covenants from others.*

At Jiffy Lube's request, unless otherwise prohibited by law, the Franchisee will obtain covenants similar in substance to those set forth in this section 19 from any of its stockholders, directors or officers. Such covenants will be in a form prescribed by Jiffy Lube and may include an acknowledgment of other obligations of the Franchisee which may affect the Franchisee's stockholders, officers and directors. To the extent that such covenants relate to periods following expiration or termination of this Agreement, or transfer of the Franchised Center or an interest in the Franchisee, then such provisions survive such expiration, termination or transfer.

19.4   *Consent to injunctive relief.*

The Franchisee acknowledges that its violation of the provisions of this section 19 would result in irreparable injury to Jiffy Lube for which no adequate remedy at law would be available. Franchisee consents to the issuance of an injunction prohibiting any conduct by the Franchisee in violation of the provisions of this section 19.

19.5   *Construction.*

19.5.1 The parties agree that each of the covenants set forth in this section 19 are to be construed independently of any other covenant or provision of this Agreement. If all or any portion of a covenant in this section 19 is held unenforceable by a court or agency having valid jurisdiction in a final decision in a matter to which Jiffy Lube is a party, then the Franchisee



agrees to be bound by any covenant which is less restrictive than, but included within, the terms of such unenforceable covenant and which imposes the maximum duty that is enforceable, as if the resulting covenant were separately stated in this section 19.

19.5.2 The Franchisee understands and acknowledges that Jiffy Lube may reduce the scope of any covenant set forth in this section 19 without the Franchisees separate consent, and that such reduction in scope will be effective immediately upon the Franchisee's receipt of written notice of it. The Franchisee agrees that it will comply with any covenant as so reduced in scope.

19.6    *Permitted ownership of publicly traded corporations.*

Nothing in this section 19 is intended to, or does, prohibit any ownership by the Franchisee or any of its stockholders, officers, directors or employees of less than a three percent beneficial interest in the equity securities of any publicly-traded corporation.

## 20.    MISCELLANEOUS

20.1    *The Franchisee is an independent contractor.*

This Agreement does not create a fiduciary relationship between Jiffy Lube and the Franchisee. The Franchisee is an independent contractor with the right to complete control and direction of the Franchised Center, subject only to the conditions and covenants established within this Agreement, the Manual and the System Manuals. No agency, employment, or partnership is created or implied by the terms of this Agreement. The Franchisee's business is totally separate from Jiffy Lube. Neither party to this Agreement will represent to anyone that it may act for the other party or that it has an agency, employment or partnership relationship with the other. Neither party has authority to act for or on behalf of the other in any manner. Neither party may create obligations or debts binding upon the other. Neither party is responsible for any obligations, expenses or debts of the other. No employee of the Franchisee is an employee of Jiffy Lube, and no employee of Jiffy Lube is an employee of the Franchisee.

20.2    *Compliance with law.*

The Franchisee will comply with all laws applicable to the operation of the Franchised Center. The Franchisee, and not Jiffy Lube, will secure and pay for all licenses, permits and inspections required by applicable laws. The Franchisee, and not Jiffy Lube, will pay all occupation, privilege, franchise, sales, use, employment, income and other taxes attributable to the Franchisee's construction, operation or ownership of the Franchised

Center. The Franchisee, and not Jiffy Lube, will pay all water, sewer, gas, telephone, electric or other utility charges assessed or charged by reason of Franchisees construction, operation or ownership of the Franchised Center.

20.3   *Effect of partial invalidity.*

This Agreement is to be construed in accordance with all applicable federal, state and local laws and regulations; any provision of this Agreement which is contrary to those laws and regulations will be deemed to be modified to the extent required to render it lawful. If any provision of this Agreement is determined to be partially or wholly invalid, that determination will not affect the validity of any other provision of this Agreement, and the remaining provisions will remain in full force and effect If any provision of this Agreement is determined to be only partially invalid, the remainder of such provision will continue to be enforced if the valid remainder of the provision continues to reflect the originally apparent intent of the parties.

20.4.   *Waiver and estoppel.*

Any failure by Jiffy Lube or the Franchisee to promptly avail itself of any default on the part of the other will not operate as an estoppel so as to prevent the nondefaulting party from asserting the default at a subsequent time.

20.5   *Time*

Time is of the essence of this Agreement.

20.6   *Interpretation.*

The caption headings of this Agreement are for convenience only and will in no way affect the manner in which any provision hereof is construed. Whenever the context requires, the singular will include the plural, the plural will include the singular, and any gender will include all other genders. If the Franchisee is a group of individuals, their liability will be joint and several. Use of the word "will" denotes a mandatory activity (*e.g.*, "the Franchisee *will* pay royalties," "the Franchisee *will not* disclose Confidential Information"). Use of the word "may," but not with the word "not" denotes a discretionary activity (*e.g.*, "Jiffy Lube *may* terminate this Agreement under certain circumstances); use of the word "may" with the word "not" denotes a mandatory prohibition (*e.g.*, "the Franchisee *may not* sell the Franchised Center"). If the Franchisee is a partnership, references to "the Franchisee" are intended to refer to all of the partnership Franchisee's general partners.



20.7 *Notices.*

Absent notice to the contrary in writing, any and all notices required to be given to Jiffy Lube or the Franchisee under this Agreement will be sent by overnight courier or telecopier addressed to such party at the address set forth beneath the signature of that party's representative in section 21 of this Agreement. Notices to officers or directors of either party may be sent to the address specified for the party itself.

20.8 *Arbitration.*

20.8.1 Rules for arbitration.

**ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING ANY CLAIM THAT THE AGREEMENT OR ANY OF ITS PROVISIONS IS INVALID, ILLEGAL, OR OTHERWISE VOIDABLE OR VOID, BUT EXCLUDING CLAIMS OF THE NATURE DESCRIBED IN SECTION 20.8.2 OF THIS AGREEMENT) OR OTHERWISE RELATED TO ANY ASPECT OF THE RELATIONSHIP BETWEEN JIFFY LUBE AND THE FRANCHISEE (INCLUDING MATTERS UNRELATED TO THIS AGREEMENT) WILL BE SUBMITTED TO ARBITRATION PURSUANT TO THE THEN-PREVAILING RULES OF THE AMERICAN ARBITRATION ASSOCIATION,** except as such rules may be modified by the following:

(a) Jiffy Lube and Franchisee will each select one arbitrator. The arbitrators selected by Jiffy Lube and Franchisee will jointly select a neutral third arbitrator, who will chair the panel and will be an attorney in good standing with substantial expertise and experience in commercial disputes involving franchising.

(b) The arbitrators will determine, consistent with the parties' objective to avoid undue expense and delay, the types, amount and timing of discovery to be provided by the parties.

(c) The arbitrators will not entertain or permit any class or consolidated proceeding.

(d) The arbitrators' fees will be borne equally by the parties. Except as provided in section 20.8.7 of this Agreement, all other costs and expenses in connection with the arbitration

will be borne initially by the party who incurs such expense or who requests a service (such as, but not limited to, a transcript of the arbitration proceeding), and at the conclusion of the arbitration proceeding, all costs and expenses (including attorney's and accountant's fees) of the prevailing party will be reimbursed by the party that does not prevail; if a party prevails on some, but not all, issues, the arbitrators will determine the manner in which such costs will be borne.

(e)     The decision of a majority of the arbitrators will be final and binding on the parties, and the arbitrators' award will be the exclusive remedy between the parties with respect to all claims, counterclaims, and issues presented or pled to the panel.     The arbitrators will have no authority to award punitive or exemplary damages.     Any award will be paid promptly, without deduction or offset.     Judgment upon the award may be entered in any court having jurisdiction over the parties and the subject matter of the dispute.     If the award is upheld by a court of competent jurisdiction in a proceeding by either party to enforce the award or to challenge the award, the party challenging the award or resisting its payment will pay, to the extent permitted by law all reasonable costs, legal fees and expenses incurred by the party defending the award or seeking its enforcement.

(f)     The decision of the arbitrators will have no collateral estoppel effect with respect to any person or entity who is not a party to the arbitration proceeding.

20.8.2 Claims not subject to arbitration.

Unless otherwise agreed by Jiffy Lube and Franchisee, at the time of the dispute, section 20.8.1 will not apply to (a) any claim involving actual or threatened disclosure or misuse of Confidential Information, (b) any claim or dispute involving the ownership, validity, or use of the Proprietary Marks, (c) any action to enjoin a transfer alleged to be in violation of section 14 of this Agreement, or (d) any action by Jiffy Lube to enforce the covenants set forth in section 19 of this Agreement, for all of which claims Jiffy Lube may seek injunctive relief according to the provisions of section 20.8.6 of this Agreement, together with such damages as Jiffy Lube may have suffered.



**20.8.3** Applicability of the Federal Arbitration Act,

Any issue regarding arbitrability or the enforcement of this section 20.8 will be governed by the Federal Arbitration Act and the federal common law of arbitration.

**20.8.4** Limitations period.

ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP OF FRANCHISEE AND JIFFY LUBE (WHETHER OR NOT ARISING OUT OF THIS AGREEMENT) WHICH IS BROUGHT BY EITHER PARTY AGAINST THE OTHER WILL BE COMMENCED WITHIN TWO YEARS FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION WILL BE BARRED.

**20.8.5** Waiver of right to trial by jury.

JIFFY LUBE AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER. JIFFY LUBE AND FRANCHISEE WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.

**20.8.6** Availability of injunctive relief.

Nothing in this Agreement will bar Jiffy Lube's right to obtain injunctive relief against threatened conduct that will cause it loss or damage, including claims of the type described in section 20.8.2 of this Agreement, according to the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions; and Franchisee agrees to pay all court costs and reasonable attorneys' fees incurred by Jiffy Lube in the event that Jiffy Lube is successful in obtaining such relief.



20.8.7 Acknowledgment of these provisions.

*THE PROVISIONS OF THIS SECTION 20.8 ARE A MATERIAL CONSIDERATION IN JIFFY LUBE'S DECISION TO ENTER THIS AGREEMENT. THE FRANCHISEE ACKNOWLEDGES THAT IT IS FREELY ENTERING THIS AGREEMENT AND MAKING THE WAIVERS SET FORTH IN THIS AGREEMENT, INCLUDING (A) THE AGREEMENT TO TAKE MOST DISPUTES TO ARBITRATION, (B) THE TWO-YEAR LIMITATIONS PERIOD, (C) THE WAIVER OF THE FRANCHISEE'S RIGHT TO A JURY TRIAL, AND (D) THE WAIVER OF ANY RIGHT TO PUNITIVE OR EXEMPLARY DAMAGES. THESE ARE ALL IMPORTANT ISSUES AND THESE ACKNOWLEDGMENTS AND WAIVERS AFFECT IMPORTANT RIGHTS. THE FRANCHISEE ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO DISCUSS THESE ISSUES WITH A LAWYER, THAT IT UNDERSTANDS THE ISSUES AT STAKE, AND THAT IT IS MAKING THESE ACKNOWLEDGMENTS AND WAIVERS WITH FULL KNOWLEDGE.*

20.9 *Entire Agreement.*

**THIS AGREEMENT AND THE ADDENDA CONTEMPLATED BY SECTION 3.2 OF THIS AGREEMENT CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT AND SUPERSEDE ALL PRIOR WRITTEN OR ORAL AGREEMENTS OR REPRESENTATIONS. THE PROVISIONS OF THIS AGREEMENT WILL BE BINDING UPON THE PARTIES AND ANY PERMITTED TRANSFEREES. EXCEPT AS OTHERWISE SPECIFIED HEREIN, THIS AGREEMENT MAY NOT BE AMENDED OR MODIFIED EXCEPT IN WRITING, SIGNED BY THE PARTIES.**

## 21.    SIGNATURES AND DATE

To confirm their agreement to the terms, conditions and acknowledgments set forth above, each party has caused its representative to set his or her signature in the space provided below as of _____, 19___:


JIFFY LUBE INTERNATIONAL, INC.        FRANCHISEE


By:_____        By:_____
     Bill Givens
     Vice President



Address for notice:

Address for notice:

Vice President - Franchise Operations
Jiffy Lube International, Inc.
700 Milam Street, Houston, TX 77002, or
P.O. Box 2967, Houston, TX 77252-2967
Telecopier: (713) 546-8484

Telecopier: _____ .

[At Jiffy Lube's option, the following may be added:]

The following shareholder, officer and/or director of the Franchisee execute this Agreement for the sole purposes of confirming his covenant to be bound by the provisions of section 19 of this Agreement, and not otherwise to assume personal liability for the performance of the Franchisee under this Agreement:

_____          _____

\*\*\*\*\*

The following entity(ies) controlled by or under common control with the Franchisee execute this Agreement for the limited purpose of indicating its (their) acknowledgment of and agreement with the provisions of section 17.4.3 of this Agreement:

[FIRST ENTITY NAME]                     [SECOND ENTITY NAME]

By:_____          By:_____ .

[Add other entities as appropriate.]



Page 55

20.8.7  Acknowledgment of these provisions.

*THE PROVISIONS OF THIS SECTION 20.8 ARE A MATERIAL CONSIDERATION IN JIFFY LUBE'S DECISION TO ENTER THIS AGREEMENT.  THE FRANCHISEE ACKNOWLEDGES THAT IT IS FREELY ENTERING THIS AGREEMENT AND MAKING THE WAIVERS SET FORTH IN THIS AGREEMENT, INCLUDING (A) THE AGREEMENT TO TAKE MOST DISPUTES TO ARBITRATION, (B) THE TWO-YEAR LIMITATIONS PERIOD, (C) THE WAIVER OF THE FRANCHISEE'S RIGHT TO A JURY TRIAL, AND (D) THE WAIVER OF ANY RIGHT TO PUNITIVE OR EXEMPLARY DAMAGES.  THESE ARE ALL IMPORTANT ISSUES AND THESE ACKNOWLEDGMENTS AND WAIVERS AFFECT IMPORTANT RIGHTS.   THE FRANCHISEE ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO DISCUSS THESE ISSUES WITH A LAWYER, THAT IT UNDERSTANDS THE ISSUES AT STAKE, AND THAT IT IS MAKING THESE ACKNOWLEDGMENTS AND WAIVERS WITH FULL KNOWLEDGE.*

20.9   *Entire Agreement.*

**THIS AGREEMENT AND THE ADDENDA CONTEMPLATED BY SECTION 3.2 OF THIS AGREEMENT CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT AND SUPERSEDE ALL PRIOR WRITTEN OR ORAL AGREEMENTS OR REPRESENTATIONS.   THE PROVISIONS OF THIS AGREEMENT WILL BE BINDING UPON THE PARTIES AND ANY PERMITTED TRANSFEREES.  EXCEPT AS OTHERWISE SPECIFIED HEREIN, THIS AGREEMENT MAY NOT BE AMENDED OR MODIFIED EXCEPT IN WRITING, SIGNED BY THE PARTIES.**

**21.   SIGNATURES AND DATE**

To confirm their agreement to the terms, conditions and acknowledgments set forth above, each party has caused its representative to set his or her signature in the space provided below as of _____, 19____.

JIFFY LUBE INTERNATIONAL, INC.          RANDY & ELISSA STEVENS

By: _____          By: _____
        Bill Givens                                      Randy Stevens
        Vice President

                                                      By: _____
                                                              Elissa Stevens

Address for notice:

Vice President - Franchise Operations
Jiffy Lube International, Inc.
700 Milam Street, Houston, TX  77002, or
P.O. Box 2967, Houston, TX 77252-2967
Telecopier:  (713) 546-8484

Address for notice:

Randy Stevens
Randy & Elissa Stevens
5386 Blue Ridge Trail
Santa Rosa, CA  95404
Telecopier: (707) 542-0826

The following shareholders, officers and/or directors of the Franchisee execute this
Agreement for the sole purposes of confirming his covenant to be bound by the
provisions of section 19 of this Agreement, and not otherwise to assume personal
liability for the performance of the Franchisee under this Agreement:

_____
Randy Stevens

_____
Elissa Stevens

\*\*\*\*\*

The following entity(ies) controlled by or under common control with the Franchisee
execute this Agreement for the limited purpose of indicating its (their) acknowledgment
of and agreement with the provisions of section 17.4.3 of this Agreement:

[FIRST ENTITY NAME]                    [SECOND ENTITY NAME]

By:_____    By:_____

[Add other entities as appropriate.]



# First Addendum to Franchise Agreement

On the terms and conditions of the Franchise Agreement to which this First Addendum is attached, the Franchisee has the right to attempt to locate specific site for a Service Center within the Area described below:

**603 Lincoln Ave.**
**Napa, CA  94558-3612**

The Franchisee acknowledges that the Area is defined in this Agreement only for purpose of identifying an area in which the Franchisee has a right to locate the Franchised Center and not as an attempt to define any particular trading area or customer base.

The Franchisee acknowledges that Jiffy Lube has made no representation that the Franchisee will be able to locate a suitable site within the Area, or that, if a site is found, the Franchisee will be able to obtain all necessary governmental consents to enable it to develop a Service Center at that site.

Finally, the Franchisee acknowledges that the time within which it will have a right to develop a Service Center in the Area is limited by the Franchise Agreement to which this First Addendum is attached.

Date:_____

JIFFY LUBE INTERNATIONAL, INC.          RANDY & ELISSA STEVENS


By:_____          By:_____
    Bill Givens                                              Randy Stevens
    Vice President

                                    By:_____
                                            Elissa Stevens

